**Hector MORALES, Petitioner–Appellant,**

v.

**Christopher ARTUZ, Superintendent, Green Haven Correctional Facility, Respondent–Appellee.**

**Docket No. 00–2730.**

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 2001.

Decided Feb. 8, 2002.

Steven J. Miraglia, New York, NY (Andrew C. Fine, Richard Joselson, The Legal Aid Society, New York, NY, on the brief), for petitioner-appellant.

Rafael A. Curbelo, Asst. District Atty., Bronx, NY (Robert T. Johnson, District Atty., Joseph N. Ferdenzi, Stuart P. Levy, Asst. District Attys., Bronx, NY, on the brief), for respondent-appellee.

Before: WALKER, Chief Judge, NEWMAN, and F.I. PARKER, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

The issue on this appeal is whether a state court defendant's constitutional right to confront the witnesses against him was violated by the trial court's permitting a principal witness to testify without removing her dark sunglasses. Hector Morales appeals from the November 17, 2000, judgment of the District Court for the Southern District of New York (John G. Koeltl, District Judge) denying his petition for a writ of habeas corpus to challenge his conviction for first-degree manslaughter and criminal use of a firearm. We conclude that the state courts did not unreasonably apply clearly established federal law, as determined by the Supreme Court of the United States, and we therefore affirm.

## Background

Sometime after midnight on a June evening in 1991, Tonita Sanchez, who would become one of two key witnesses in Morales's trial, was leaning out of her first-floor apartment window in the Bronx, ten feet above the sidewalk, engaged in conversation with her friends, Jaime Padilla and Tommy Villanueva, who were on the street below. The area was illuminated by a street light and light from Sanchez's apartment building. As Sanchez would later testify, Morales, whom she recognized, walked up to Villanueva and said "You are the one" (or words to that effect), pulled out a gun, and as Villanueva was running away, shot him once in the back. Villanueva continued to run, then collapsed in

the street, and died. After the shooting, Padilla, who knew Morales well and who became the other key witness, started running away, and then, seeing no one behind him, ran back to the apartment building to get a gun from a friend. Padilla testified that he was going to shoot petitioner, but could not find him. The next time Padilla saw Morales was when he picked him out of a lineup.

Morales was charged with two counts of murder and related charges. The prosecution's case rested primarily on the eyewitness testimony of Sanchez and Padilla. A first trial ended in a mistrial, when the jury could not reach a unanimous verdict.

*The sunglasses episode.* Before Sanchez testified at the second trial, the prosecutor informed the state court trial judge that the witness wanted to wear her sunglasses while testifying, as she had done at the first trial. Defense counsel objected. The trial judge initially ruled against allowing her to wear the sunglasses. After Sanchez was sworn in as a witness, the following colloquy ensued:

> THE COURT: Okay Miss Sanchez, I've advised Mr. Racolin [the prosecutor] that although I understand that you're somewhat nervous and shy and that you prefer to wear those sunglasses[,] that it is not proper for you to testify. I don't believe and it does not provide the defendant with adequate opportunity to exam[ine] you and it does not provide the jurors with the opportunity to evaluate your credibility, if they can't see your eyes. So I'm going to require you to take those sunglasses off during your testimony. You understand that?
>
> THE WITNESS: I'm not going to take them off.
>
> THE COURT: Pardon me?
>
> THE WITNESS: I'm not going to take them off.

> THE COURT: Well, Miss Sanchez, I don't mean to be unsympathetic in any[ ]way but you're in a court of law now and I'm the Judge.
>
> THE WITNESS: Well and I'm the witness.

Sanchez remained intransigent, and after two recesses and extensive colloquy with counsel, the trial judge relented and permitted her to testify with her sunglasses on.

The trial judge acknowledged that the sunglasses were "dark," and that "you can't see through them," presumably referring to the inability of anyone in the courtroom to see the witness's eyes. He noted that the witness exhibited a "great fear" as evidenced by the fact that she was willing to risk imprisonment for disobeying the Court's order, and he found her fear justified in light of the defendant's prior record and the presence in the courtroom of his friends. He concluded that however "partially" the defendant's right to confrontation would be infringed was outweighed by the necessity of having her provide critical testimony in a serious case.

The jury found Morales guilty of first-degree manslaughter and first-degree criminal use of a firearm, and he was sentenced to concurrent terms of 12½ to 25 years in prison. The Appellate Division affirmed the conviction, *People v. Morales,* 246 A.D.2d 302, 666 N.Y.S.2d 410 (1st Dept.1998), and leave to appeal to the Court of Appeals was denied, *People v. Morales,* 91 N.Y.2d 975, 672 N.Y.S.2d 855, 695 N.E.2d 724 (1998). The Appellate Division noted that the trial judge had "properly concluded that the procedure was justified by the necessities of the case" and that any error was "harmless in view of the overwhelming evidence of guilt and the minimal impact of the sunglasses on the jury's ability to assess the credibility of the

witness." *Morales*, 246 A.D.2d at 303, 666 N.Y.S.2d 410.

Morales filed a petition for habeas corpus, which the District Court denied. The Court concluded that no clearly established Supreme Court law had interpreted the right of confrontation to preclude a witness from testifying with minimal disguise, and that the state trial judge had made a sufficient case-specific justification for permitting Sanchez to wear sunglasses. *Morales v. Artuz*, No. 98 CIV. 6558(JGK), 2000 WL 1693563, at *3 (S.D.N.Y. Nov.13, 2000).

## Discussion

The standard for review of state court determinations in federal habeas corpus proceedings is provided by 28 U.S.C. § 2254(d), which states that a writ of habeas corpus

> shall not be granted ... unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See also Williams v. Taylor*, 529 U.S. 362, 402–03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

There can be no question that the right of a defendant to confront the witnesses against him has been clearly established in decisions of the Supreme Court, *e.g., Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), but whether that right is impaired by a witness testifying with the minimal disguise of sunglasses is far less clear. In two decisions that reached different outcomes,

the Court considered whether the right of confrontation was violated by arrangements that precluded the normal face-to-face confrontation that occurs when a witness testifies in the unobstructed view of the defendant. In *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the Court found a Confrontation Clause violation where young female witnesses, accusing the defendant of sexual assault, were permitted to testify behind a screen that prevented their seeing the defendant although it allowed him "dimly" to perceive them. *Id.* at 1015, 108 S.Ct. 2798. However, in *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the Court upheld permitting a young female victim of sexual assault to testify by one-way closed circuit television where necessary to further an important state interest and to protect the welfare of the witness.

These two precedents clearly establish that where the defendant and witness are physically separated, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850, 110 S.Ct. 3157; *see also Coy*, 487 U.S. at 1021, 108 S.Ct. 2798 (stating that any exception to face-to-face confrontation "would surely be allowed only when necessary to further an important public policy"). Although *Craig* and *Coy* set forth the appropriate test where the witness is physically separated from the defendant, none of the cases thus far decided by the Supreme Court deals with our precise context—a witness testifying in the presence of the defendant and the jury with a slight disguise that prevents the defendant and the jurors from seeing the witness's eyes.

Indeed, the Court has not considered any case involving a disguise that obscures the normal opportunity to observe all aspects of a witness's demeanor.[1] Thus, we doubt that the *Craig, Coy* test can be considered "clearly established" law under these circumstances for the purposes of 28 U.S.C. § 2254(d).

In considering whether the right of confrontation was denied, we note the sometimes varying rationales that the Supreme Court has given concerning that right. In *Van Arsdall,* the Court said that "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." 475 U.S. at 678, 106 S.Ct. 1431 (quoting *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)); *see Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) ("[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination."). In addition to cross-examination, the Court has emphasized "the right [of a defendant] physically to face those who testify against him." *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). In some contexts, the Court appears to have valued cross-examination more significantly than a face-to-face encounter by rejecting challenges to use of out-of-court testimony that was subject to prior cross-examination. *See California v. Green,* 399 U.S. 149, 165–68, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (testimony at preliminary hearing admissible); *Mattox v. United States,* 156 U.S. 237, 243–44, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (testimony at prior trial admissible); *cf. Douglas,* 380 U.S. at 419, 85 S.Ct. 1074 (alleged confession of witness inadmissible because not subject to cross-examination); *see also* 5 *Wigmore on Evidence* § 1395, at 150 (Chadbourn rev. 1974) ("The main and essential purpose of confrontation is *to secure for the opponent the opportunity for cross-examination.*") (emphasis in original); *id.* at 153, 85 S.Ct. 1074 ("There is, however, a *secondary* advantage to be obtained by the personal appearance of the witness; the *judge* and the *jury* are enabled to obtain the elusive and incommunicable evidence of a *witness' deportment while testifying* ....") (first emphasis supplied).

With respect to the value of a face-to-face encounter, the Court has emphasized different virtues. In *Coy,* the Court noted the importance of having the *witness* look directly at the *defendant* when providing accusatory testimony. "The phrase still persists, 'Look me in the eye and say that.'" *Coy,* 487 U.S. at 1018, 108 S.Ct. 2798. Justice Scalia, the author of *Coy,* expanded on this thought in his subse-

---

**1.** In considering, upon rehearing in banc, whether courtroom closure during a police officer's testimony violated a defendant's constitutional right to a public trial, members of our Court have expressed various views on the alternative of having the witness testify with sufficient disguise to conceal the witness's identity. *Compare Ayala v. Speckard,* 131 F.3d 62, 71 (2d Cir.1997) (in banc) (*"Ayala III"*) ("Disguising the witness risks lessening the jury's opportunity to observe the witness's demeanor and assess credibility ...."), *with id.* at 77 (Parker, J., dissenting) ("Numerous alternatives to closure existed in the cases at bar.... [T]he officer could have worn a disguise."). Differing views were also expressed in the panel opinions that resulted in, and were superceded by, the rehearing in *Ayala III, compare Pearson v. James,* 105 F.3d 828, 830 (2d Cir.1997) ("disguise might impair the jury's ability to assess the credibility of the [witness]"), *with Okonkwo v. Lacy,* 104 F.3d 21, 26 (2d Cir.1997) (identifying "disguise of the witness" as alternative that may be considered), *and Ayala v. Speckard,* 102 F.3d 649, 653 (2d Cir.1996) (same). In the pending case, Judge Koeltl considered these differing views persuasive "that there is no 'clearly established' federal law, as determined by the Supreme Court, that a witness's use of sunglasses or other minimal disguises while testifying constitutes a violation of the Confrontation Clause." *Morales,* 2000 WL 1693563, at *3 n. 4.

quent dissent in *Craig.* He decried the loss of the opportunity for a parent accused of molesting a child to ask the child on the witness stand, " '[I]t is really not true, is it, that I—your father (or mother) whom *you* [the witness] see before you— did these terrible things?' " *Craig,* 497 U.S. at 861, 110 S.Ct. 3157 (Scalia, J., dissenting) (emphasis added); *see Ohio v. Roberts,* 448 U.S. 56, 63 n. 6, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) ("[T]he requirement of personal presence ... undoubtedly makes it more difficult to lie against someone, particularly if that person is an accused and present at trial.") (citation and internal quotation marks omitted).

On the other hand, writing for the majority in *Coy,* Justice Scalia recalled the Court's statement in *Kirby v. United States,* 174 U.S. 47, 55, 19 S.Ct. 574, 43 L.Ed. 890 (1899), that the Confrontation Clause assures the defendant the presence of witnesses "upon whom *he* [the defendant] can look while being tried." *Coy,* 487 U.S. at 1017, 108 S.Ct. 2798 (emphasis added). The Court has noted the virtue " 'of compelling [the witness] to stand face to face with the jury in order that *they* may look at *him,* and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " *Green,* 399 U.S. at 158, 90 S.Ct. 1930 (emphases added) (quoting *Mattox,* 156 U.S. at 242–43, 15 S.Ct. 337); *see Roberts,* 448 U.S. at 63 n. 6, 100 S.Ct. 2531 ("[O]ne critical goal of cross-examination is to draw out discrediting demeanor to be viewed by the factfinder.") (citation omitted).

To the extent that the Supreme Court's "established law" of confrontation seeks to assure cross-examination and an opportunity for the *witness* to see the *defendant,* Sanchez's sunglasses created no impairment. On the other hand, to the extent that the right assures an opportunity for the defendant and especially the jurors to see the witness's eyes in order to consider her demeanor as an aid to assessing her credibility, some impairment occurred. Seeing a witness's eyes has sometimes been explicitly mentioned as of value in assessing credibility. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 270, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (Rehnquist, J., dissenting) ("[The witness] fidgets when answering critical questions, his eyes shift from the floor to the ceiling, and he manifests all other indicia traditionally attributed to perjurers."); *Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992) (including "eye contact" among factors aiding fact-finder in assessing witness's credibility), *vacated on other grounds,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Penthouse International, Ltd. v. Dominion Federal Savings & Loan Ass'n,* 855 F.2d 963, 974 (2d Cir.1988) (noting that trial judge had included "the glaze that came over [the witness's] shifty eyes" among factors indicating perjury). In *Coy,* the Court noted that the trier of fact could "draw its own conclusions" if the witness looked away from the defendant. 487 U.S. at 1019, 108 S.Ct. 2798.[2]

The obscured view of the witness's eyes, however, resulted in only a minimal impairment of the jurors' opportunity to as-

**2.** Seeing a person's eyes has also been deemed of value in contexts other than the witness stand, such as assessing:

(a) reasonable suspicion for a *Terry* stop, *see United States v. Vasquez,* 612 F.2d 1338, 1348 (2d Cir.1979) (Kaufman, C.J., concurring) ("darting eyes"); *United States v. Love,*

413 F.Supp. 1122, 1127 n. 7 (S.D.Tex.1976) ("shifty eyes");

(b) inebriation, *Fersner v. Prince George's County,* 138 F.Supp.2d 685, 688 (D.Md.2001) ("a faraway glaze [sic] over his eyes") (brackets in original); *United States v. Regan,* 93

sess her credibility. Even if we accept the idea, grounded perhaps more on tradition than on empirical data,[3] that demeanor is a useful basis for assessing credibility,[4] the jurors had an entirely unimpaired opportunity to assess the delivery of Sanchez's testimony, notice any evident nervousness, and observe her body language. Most im-

F.Supp.2d 82, 84 (D.Mass.2000) ("his eyes were bloodshot");

(c) narcotics use, *United States v. Carter*, 480 F.2d 981, 983 (9th Cir.1973) ("pinpointed eyes");

(d) grounds for a peremptory challenge of a juror, *United States v. Hendrieth*, 922 F.2d 748, 749 (11th Cir.1991) (juror "rubbing and rolling her eyes during voir dire");

(e) a defendant at sentencing, *Del Piano v. United States*, 575 F.2d 1066, 1069 (3d Cir. 1978) (presence of defendant assures opportunity to evaluate the total person, including "the revealing look into the eyes");

(f) the credibility of a person being questioned by a police officer, *Craig v. Singletary*, 127 F.3d 1030, 1035 (11th Cir.1997) ("[The suspects's] demeanor, and particularly the shifting of his eyes away from eye contact with [the officer], convinced [the officer] that [the suspect] was lying."); *Purvis v. Dugger*, 932 F.2d 1413, 1420 n. 3 (11th Cir.1991) ("[T]hen when [the suspect] did say that he killed her, he sat down and he looked downward with his eyes and appeared more relaxed as if unburdening himself. . . ."); *United States v. Timmermann*, 806 F.2d 258, 1986 WL 18200, at *1 (4th Cir.1986) (unpublished table decision) ("He [the suspect] told me [the officer] he was innocent, and from his demeanor, I believed him. I saw truth in his eyes . . . ."); and

(g) the reliability of an identification of a defendant, *United States ex rel. Geralds v. Deegan*, 292 F.Supp. 968, 974 (S.D.N.Y.1968) (eyes included among characteristics observed).

3. *See* Jeremy A. Blumenthal, *A Wipe of the Hands, a Lick of the Lips: The Validity of Demeanor Evidence in Assessing Witness Credibility*, 72 Neb. L.Rev. 1157, 1163 (1993) ("Social science had produced overwhelming evidence refuting the ability of people to identify that a witness is lying when the witness is actually being deceptive. Yet jurists persist in the fallacious belief-unfounded yet attributed to common sense-that this ability exists."); Olin Guy Wellborn III, *Demeanor*, 76 Cornell L.Rev. 1075, 1075 (1991) ("According to the empirical evidence, ordinary people cannot make effective use of demeanor in deciding whether to believe a witness. On the contrary, there is some evidence that the observation of demeanor diminishes rather than enhances the accuracy of credibility judgments."); *see also* I. Daniel Stewart, Jr., *Perception, Memory, and Hearsay: A Criticism of Present Law and The Proposed Federal Rules of Evidence*, 1970 Utah L.Rev. 1, 23 ("Although highly regarded by the judges and attorneys, the value of demeanor evidence as a means of determining testimonial reliability has yet to be demonstrated factually.").

4. "Tradition has it that the trier of facts can better evaluate credibility by observing the witness on the stand. Although doubt has been cast on this proposition, and it has proved all but impossible to articulate what the trier of facts looks for, the tradition nonetheless endures." Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 802.02[2][b], at 802–8 (Joseph M. McLaughlin ed., 2d ed.2001). The "tradition" has its renowned supporters, *e.g.*, *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) (L.Hand, J.) ("[Demeanor] evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story."); *NLRB v. Dinion Coil Co.*, 201 F.2d 484, 487 (2d Cir. 1952) (Frank, J.) ("True, demeanor evidence may sometimes mislead; but our courts regard it nevertheless as an excellent clue to the trustworthiness of testimony."), and its skeptics, *e.g.*, *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1084, 1084, 1086 (9th Cir. 1977) (Duniway, J., concurring and dissenting in part) ("I am convinced, both from experience as a trial lawyer and from experience as an appellate judge, that much that is thought and said about the trier of fact as a lie detector is myth and folklore. . . . Anyone who really believes that he can infallibly determine credibility solely on the basis of observed demeanor is naive."), for whom an English judge well summarized the basis for doubt:

> I question whether the respect given to our findings of fact based on the demeanour of the witnesses is always deserved. I doubt my own ability, and sometimes that of other judges, to discern from a witness's demeanour, or the tone of his voice, whether he is

portant, they had a full opportunity to combine these fully observable aspects of demeanor with their consideration of the substance of her testimony, assessing her opportunity to observe, the consistency of her account, any hostile motive, and all the other traditional bases for evaluating testimony.[5] All that was lacking was the jury's ability to discern whatever might have been indicated by the movement of her eyes.[6]

In sum, we doubt that permitting Sanchez to testify behind dark sunglasses was contrary to constitutional law established by the Supreme Court, but even if the law of the Confrontation Clause, as established by the Supreme Court, is, as the Appellant contends, a generalized right to face-to-face confrontation, the state courts did not make an unreasonable application of such law.

### Conclusion

The judgment of the District Court is affirmed.

---

telling the truth. He speaks hesitantly. Is it the mark of a cautious man, whose statements are for that reason to be respected, or is he taking time to fabricate? Is the emphatic witness putting on an act to deceive me, or is he speaking from the fullness of his heart, knowing that he is right? Is he likely to be more truthful if he looks me straight in the face than if he casts his eyes on the ground, perhaps from shyness or a natural timidity? For my part I rely on these considerations as little as I can help.
Sir Brian MacKenna, *Discretion*, Irish Jurist 1, 10 (1974), *quoted in Garland v. Secretary of Health and Human Services*, 528 F.Supp. 415, 417 n. 1 (E.D.Mich.1981).

5. *See* Wellborn, *supra* note 3, at 1104–05 ("To the extent that people can detect lying or erroneous beliefs in another, they do so primarily by paying close attention to the content of what the other says, not by observing facial expression, posture, tone of voice, or other nonverbal behavior.").

6. In an early English trial, the complaint that the witness was not looking at the defendant, presumably preventing the defendant from seeing the witness's eyes, precipitated the following exchange:

The defendant: "I beg your lordships that he may look me in the face.... I desire the letter of the law, which says my accuser shall come face to face."
The Court: "My lord [the defendant Earl of Stafford], you do see the witness; that is enough for face to face."
*Earl of Stafford's Trial*, 7 How. St. Tr. 1293, 1341 (1680), *quoted in* 5 *Wigmore on Evidence* § 1399, at 200 n. 2 (Chadbourn rev.1974).