In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00072-CR
______________________________


ISRAEL G. ROMERO, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 179th Judicial District Court
Harris County, Texas
Trial Court No. 911610


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N

Â Â Â Â Â Â Â Â Â Â Â Â When subpoenaed State's witness, Cesar Hiran Vasquez, appeared at Israel G. Romero's
aggravated assault trial wearing dark sunglasses, a baseball cap pulled low over his eyes, and a jacket
with an upturned collar, leaving visible only Vasquez's ears, the tops of his cheeks, and the bridge
of his nose, the trial court, over defense counsel's objection, allowed Vasquez to testify in the
"disguise." We must decide whether that violated Romero's rights under the Confrontation and Due
Process Clauses. We hold it did.
Â Â Â Â Â Â Â Â Â Â Â Â Romero was indicted for aggravated assault after a May 2002 shooting incident outside a
Harris County nightclub. On the first day of trial, it became clear one of the State's witnesses,
Vasquez, was reluctant to testify. Although Vasquez was in the building, he simply refused to enter
the courtroom even after the trial court ordered him to pay a $500.00 fine for refusing to comply with
the State's subpoena. Vasquez finally entered the courtroomâsometime between one and a half to
three hours after arriving at the courthouseâonly after the State agreed he could testify in his
disguise. 
Â Â Â Â Â Â Â Â Â Â Â Â When Vasquez entered dressed in his disguise, and while still outside the presence of the
jury, Romero's counsel objected to Vasquez's appearance, arguing he should not be permitted to
testify in disguise on the grounds that it would be highly prejudicial and a violation of Romero's
constitutionally protected rights. Although Vasquez stated he was afraid to testify against Romero
because he had witnessed how dangerous Romero could be and feared Romero would seek revenge,
he admitted he had neither seen Romero since the incident nor been threatened by Romero in any
way. Nevertheless, citing his own safety, Vasquez maintained he would not testify in front of
Romero without being able to wear his disguise. 
Â Â Â Â Â Â Â Â Â Â Â Â After hearing both Romero's and the State's arguments on the issue, and without further
commenting on its ruling, the trial court simply stated it would allow Vasquez to testify as he was. 
At the close of the evidence, including Vasquez's eyewitness testimony, the jury found Romero
guilty of aggravated assault and assessed punishment at ten years' confinement. Romero now
appeals, contending the trial court erred by (1) allowing Vasquez to testify in disguise, violating
Romero's Â rights Â to Â confront Â one Â of Â the Â State's Â witnesses Â and Â to Â be Â presumed Â innocent, Â and
(2) admitting evidence of an unadjudicated extraneous offense during the punishment phase of the
trial. Right to Confrontation
Â Â Â Â Â Â Â Â Â Â Â Â Applicable to the states through the Due Process Clause, Pointer v. Texas, 380 U.S. 400,
403â06 (1965), the Confrontation Clause provides that "[i]n all criminal prosecutions, the accused
shall enjoy the right . . . to be confronted with the witnesses against him," U.S. Const. amend. VI. 
Normally, the right to confront one's accuser is satisfied if defense counsel is given wide latitude to
question an adverse witness; but the Confrontation Clause provides a criminal defendant not only
the right to cross-examination, but also the right to physically face those who testify against him. 
Pennsylvania v. Ritchie, 480 U.S. 39, 51â53 (1987). Romero contends the latter right was violated.
Â Â Â Â Â Â Â Â Â Â Â Â Addressing a similar issue in Coy v. Iowa, 487 U.S. 1012 (1988), the United States Supreme
Court reversed and remanded a decision allowing two child witnesses to testify behind a large screen
separating them from the defendant accused of sexually abusing them. Noting there has never been
any doubt "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses
appearing before the trier of fact," the Court pointed out "there is something deep in human nature
that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a
criminal prosecution.'" Id. at 1016â17 (quoting Pointer, 380 U.S. at 404). Considering that this
concept "traces back to the beginnings of Western legal culture," the Court found it interesting that
the phrase "Look me in the eye and say that" still persists and bears considerable significance. Id.
at 1015, 1018. With this understanding, "the right of confrontation 'contributes to the establishment
of a system of criminal justice in which the perception as well as the reality of fairness prevails.'" 
Id. at 1018â19 (quoting Lee v. Illinois, 476 U.S. 530, 540 (1986)).
Â Â Â Â Â Â Â Â Â Â Â Â Unlike the present case in which a witness concealed his face from the defendant, judge, and
jury, the screen employed in Coy was designed to enable the defendant to dimly perceive the
complaining witnesses, at the same time lessening the witnesses' unease by blocking the defendant
from their view. Id. at 1014â15, 1020. Under those circumstances, the Court stated: "It is difficult
to imagine a more obvious or damaging violation of the defendant's right to a face-to-face
encounter." Id. at 1020. The violation in this case is worse than in Coy because Vasquez's disguise
was aimed at blocking not his view of Romero, but Romero's view of him.
The Confrontation Clause does not, of course, compel the witness to fix his eyes
upon the defendant; he may studiously look elsewhere, but the trier of fact will draw
its own conclusions. Thus the right to face-to-face confrontation serves much the
same purpose as a less explicit component of the Confrontation Clause that we have
had more frequent occasion to discussâthe right to cross-examine the accuser; both
"ensur[e] the integrity of the factfinding process."

Id. at 1019â20 (quoting Kentucky v. Stincer, 482 U.S. 730, 736 (1987)). While the Coy Court
conceded that "rights conferred by the Confrontation Clause are not absolute, and may give way to
other important interests," it declined to identify any such exception because there were no
individualized trial court findings that the witnesses in that case needed special protection. Id. at
1020â21. In Maryland v. Craig, 497 U.S. 836 (1990), the Supreme Court was once again asked to
address a defendant's right to confront adverse witnesses face to face. This time, however, in light
of the trial court's individualized findings that the child witness involved needed special protection,
the Court was required to decide the question reserved in Coy. Id. at 845. Specifically, the Court
had to determine whether the Confrontation Clause "categorically prohibits a child witness in a child
abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by
one-way closed circuit television." Id. at 840.
Â Â Â Â Â Â Â Â Â Â Â Â Citing its earliest case interpreting the Confrontation Clause, the Court in Craig stated the
clause's primary purpose was to prevent depositions or ex parte affidavits from being used against
a defendant in lieu of testimony subject to cross-examination. Cross-examination in the physical
presence of the accused allows the accused not only to test the recollection and sift the conscience
of the witness, but also to compel him or her "to stand face to face with the jury in order that [its
members] may look at him, and judge by his demeanor upon the stand and the manner in which he
gives his testimony whether he is worthy of belief." Id. at 845 (quoting Mattox v. United States, 156
U.S. 237, 242â43 (1895)). The Confrontation Clause, therefore,
(1) insures that the witness will give his statements under oathâthus impressing him
with the seriousness of the matter and guarding against the lie by the possibility of
a penalty for perjury; (2) forces the witness to submit to cross-examination . . . ; [and] 

(3) permits the jury that is to decide the defendant's fate to observe the demeanor of
the witness in making his statement, thus aiding the jury in assessing his credibility.




Id. at 845â46 (quoting California v. Green, 399 U.S. 149, 158 (1970)) (emphasis added).
Â Â Â Â Â Â Â Â Â Â Â Â Reiterating the position taken in Coy, the Court explained that a defendant's right to face-to-face confrontation is not absolute. Id. at 849â50. Nevertheless, the requirement may not easily be
dispensed with because "a defendant's right to confront accusatory witnesses may be satisfied absent
a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary
to further an important public policy and only where the reliability of the testimony is otherwise
assured." Id. Ultimately, the facts presented in Craig indicated that all of the other elements of the
right to confrontation were met because the Maryland statute permitting testimony via one-way
closed circuit television also (1) required child witnesses to be competent to testify, doing so under
oath; (2) allowed the defendant the opportunity for contemporaneous cross-examination; and
(3)Â enabled the judge, jury, and defendant to view the demeanor (and body) of the testifying witness. 
Id. at 851.
Â Â Â Â Â Â Â Â Â Â Â Â Even with these assurances, however, weighing the State's transcendent interest in protecting
the physical and emotional welfare of children against the Confrontation Clause's "preference" for
face-to-face confrontation is not enough. See id. at 849â50; Coy, 487 U.S. at 1024â25 (O'Connor,
J., concurring). In fact, although the Court upheld the Maryland statute at issue in Craig, it did so
because the State made an adequate showing, and the trial court made a case-specific finding, of
necessity, evidencing the trauma that would be caused by compelling the particular child witness in
that case to confront her alleged abuser.


 Craig, 497 U.S. at 855.
Â Â Â Â Â Â Â Â Â Â Â Â A number of dissimilarities between Craig and the present case demonstrate the violation
of Romero's constitutional right to confront, face to face, one of the witnesses against him. First, the
procedure discussed in Craig, which was designed to lessen the witness' trauma from testifying in
the physical presence of the defendant, still enabled the judge, jury, and defendant to view the
demeanor of the witness as she testified. Id. at 851. "[M]indful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding," id., we note that, although
Vasquez's disguise did not remove him from the physical presence of the defendant, neither the
defendant nor the trier of fact was fully able to "look at him, and judge by his demeanor upon the
stand and the manner in which he [gave] his testimony whether he [was] worthy of belief," Mattox,
156 U.S. at 243. Second, the State's interest in protecting child witnesses from the trauma of
testifying in a child abuse case was held to be "sufficiently important to justify the use of a special
procedure that permits a child witness in such cases to testify . . . in the absence of face-to-face
confrontation with the defendant." Craig, 497 U.S. at 855. In the present case, the State failed to
identify any such interest, and Vasquez is an adult. Third, even if the State had identified an interest
sufficiently important to justify abridging Romero's right to confront Vasquez, unlike the situation
in Craig, the trial court failed to make any case-specific findings of necessity. See id. at 855â58. 
Considering the facts of this case, Romero's right to confrontation was unjustifiably violated, absent
a finding of necessity, when Vasquez testified in disguise.
Â Â Â Â Â Â Â Â Â Â Â Â We note only one other case that has addressed a similar issue. In People v. Morales, 666
N.Y.S.2d 410, 411 (N.Y. App. Div. 1998) [hereinafter Morales I] (emphasis added), New York's
Appellate Division, First Department, determined that a defendant "was not denied his right of
confrontation . . . when a witness for the prosecution was permitted to testify while wearing
sunglasses, at her insistence, for purposes of disguise. . . . [because] the procedure was justified by
the necessities of the case." When the New York Court of Appeals denied leave to appeal, People
v. Morales, 695 N.E.2d 724 (N.Y. 1998), the defendant thereafter filed a habeas corpus petition in
federal district court, which was ultimately denied (and affirmed on appeal) because the
Confrontation Clause claim was insufficient to provide a basis for habeas relief. Morales v. Artuz,
No. 98 Civ. 6558, 2000 U.S. Dist. LEXIS 16405 (S.D.N.Y. 2000) [hereinafter Morales II], aff'd, 
281 F.3d 55 (2d Cir. 2002) [hereinafter Morales III], cert. denied, Morales v. Greiner, 537 U.S. 836
(2002).



Â Â Â Â Â Â Â Â Â Â Â Â These courts reached their decisions, at least in part, after determining the trial court properly
concluded the witness' disguise was justified by the necessities of the case. Morales I, 666 N.Y.S.2d
at 411; Morales II, 2000 U.S. Dist. LEXIS 16405, at *12â14; Morales III, 281 F.3d at 57â58. In
Morales I,
[t]he trial judge found, after hearing the witness's explanation and observing her
demeanor and after extensive discussion with counsel, that [she] had a real and
justified fear of testifying. The court noted that it was apparent [the witness] would
not testify without the sunglasses and that she was prepared to defy the court's order. 
The court found that she was terrified of the defendant. In order to obtain what the
trial judge viewed as testimony "extremely relevant and material to the guilt or
innocence of the defendant," he determined that it was "necessary" to allow her to
testify with the sunglasses. Moreover, permitting [the witness] to wear sunglasses
while testifying is a relatively modest imposition on the right to face-to-face
confrontation that the trial court properly found was justified by the necessities of the
case. Thus, the trial court identified the correct legal rule and determined that [the
witness] could wear her sunglasses. This finding was not "contrary to" or an
objectively unreasonable application of Coy and Craig's Confrontation Clause
doctrine.

Morales II, 2000 U.S. Dist. LEXIS 16405, at *12â13 (explaining the balancing of interests in
Morales I) (citations omitted). In the present case, however, no such finding of necessity was made. 
The record, in fact, reveals two instances where the trial court mentioned the issue, but contains
neither an explanation for overruling Romero's objections nor a finding to support that ruling.


 There appears in the record no balancing of the State's interest in obtaining evidence "extremely relevant
and material to the guilt or innocence of the defendant" against the "imposition on the right to face-to-face confrontation," as did the New York courts, Morales II, 2000 U.S. Dist. LEXIS 16405, at
*12â13. We find only the trial court's statement, "I'm going to allow the witness to testify in shades,
a ball cap, and with his collar turned up." 
Â Â Â Â Â Â Â Â Â Â Â Â In a situation more similar to the one presented in Craig, the Texas Court of Criminal
Appeals reiterated that "a defendant's right to confront accusatory witnesses may be satisfied absent
a physical, face-to-face confrontation at trial only when denial of such confrontation is necessary to
further an important public policy and the reliability of the testimony is otherwise assured." Marx
v. State, 987 S.W.2d 577, 580 (Tex. Crim. App. 1999) (citing Craig, 497 U.S. at 850â51). There,
the trial court's decision to allow two child witnesses to testify via two-way closed circuit television
avoided violating the Confrontation Clause because the court explicitly found, as a matter of fact,
that the special procedure was necessary to protect the children from the emotional trauma of having
to testify in the defendant's physical presence. Id. The court went on to state that "the requisite
reliability of the children's testimony was assured because they testified after promising to do so
truthfully, they were subject to cross-examination, and the jury was able to observe their demeanor." 
Id. at 581 (emphasis added).
Â Â Â Â Â Â Â Â Â Â Â Â Even if the trial court had made a case-specific finding of necessity, we doubt that, under
the circumstances, allowing an adult witness to substantially conceal his or her face while testifying
in a criminal trial would pass constitutional muster. The three assurances of reliability mentioned
in the preceding paragraph's discussion of Marx are the same constitutional guarantees identified in
Mattox and Green and re-emphasized in Craig. That is, in addition to ensuring that a witness gives
his or her statements under oath and requiring the witness to submit to cross-examination, the
Confrontation Clause also ensures that the trier of fact will be permitted to observe the witness'
demeanor, aiding in the assessment of his or her credibility. Craig, 497 U.S. at 845â46; Green, 399
U.S. at 158; Mattox, 156 U.S. at 242â43.
Â Â Â Â Â Â Â Â Â Â Â Â While the validity of demeanor evidence in assessing witness credibility has been questioned,
see, e.g., Morales III, 281 F.3d at 61 nn.3â4, it is clear that such evidence is deeply rooted in our
legal culture and tradition, and the Supreme Court's opinions relating to this matter provide no
indication that a break with precedent is forthcoming. Craig, 497 U.S. at 844; Coy, 487 U.S. at
1015â20. In fact, tracing the origins of the right of confrontation to Roman law, Coy, 487 U.S. at
1015â16, the Court has repeatedly emphasized that "the irreducible literal meaning of the
[Confrontation] Clause . . . [is] 'a right to meet face to face all those who appear and give evidence
at trial,'" id. at 1021 (quoting Green, 399 U.S. at 175 (Harlan, J., concurring)), and that "it is this
literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by
the Confrontation Clause." Green, 399 U.S. at 157. It is interesting to note, therefore, that the
Second Circuit Court of Appeals downplayed the guarantee of a generalized right to face-to-face
confrontation, expressing its doubts that permitting a witness to testify in a criminal trial while
wearing dark sunglasses is contrary to constitutional law. Morales III, 281 F.3d at 62. The court
explained:
The obscured view of the witness's eyes . . . resulted in only a minimal impairment
of the jurors' opportunity to assess her credibility. Even if we accept the idea,
grounded perhaps more on tradition than on empirical data, that demeanor is a useful
basis for assessing credibility, the jurors had an entirely unimpaired opportunity to
assess the delivery of [the witness's] testimony, notice any evident nervousness, and
observe her body language. Most important, they had a full opportunity to combine
these fully observable aspects of demeanor with their consideration of the substance
of her testimony, assessing her opportunity to observe, the consistency of her
account, any hostile motive, and all the other traditional bases for evaluating
testimony. All that was lacking was the jury's ability to discern whatever might have
been indicated by the movement of her eyes.

Id. at 60â62 (citations omitted).
Â Â Â Â Â Â Â Â Â Â Â Â Despite the court's claim that the jury had "an entirely unimpaired" opportunity to assess the
witness' demeanor apart from "whatever might have been indicated by the movement of her eyes,"
it acknowledged that this, at least, resulted in "a minimal impairment" of the jury's opportunity to
assess the witness' credibility. Id. The court itself cited a number of cases in which seeing a witness'
eyes has been explicitly mentioned as being of value in assessing credibility, and even noted other
cases in which "[s]eeing a person's eyes has . . . been deemed of value in contexts other than on the
witness stand." Id. at 60 & n.2. Nevertheless, the Second Circuit apparently concluded that any
impairment in the ability to assess the witness' demeanor due to her dark sunglasses was outweighed
by other factors available for the jury's consideration. Id. at 61â62.
Â Â Â Â Â Â Â Â Â Â Â Â Such a balancing test between the various elements of a witness' demeanor and his or her
actual testimony to determine which of the elements may be dispensable, however, appears
unwarranted under Coy and Craig. Similar to the defendant in Morales III, for example, the
defendant in Coy was still given the opportunity to assess the delivery of testimony, notice any
evident nervousness, observe body language (albeit "dimly"), and to combine these aspects of
demeanor with the substance of the testimony itself, yet the Supreme Court determined that the use
of a one-way screen separating the witness from the defendant clearly violated that defendant's right
to a face-to-face encounter. Coy, 487 U.S. at 1020. We have no doubt that testifying in a defendant's
physical presence may "upset the truthful rape victim or abused child," but so testifying "may also
confound and undo the false accuser, or reveal the child coached by a malevolent adult." Id. In the
same vein, we recognize that a witness may feel, justifiably, intimidated or frightened by the prospect
of facing a criminal defendant accused of a violent crime, but we note also "that constitutional
protections have costs." Id. "In this country, if someone dislikes you, or accuses you, he must come
up in front. He cannot hide behind the shadow." Id. at 1018 (quoting President Eisenhower,
Address to the B'nai B'rith Anti-Defamation League (Nov. 23, 1953), quoted in Pollitt, The Right
of Confrontation: Its History and Modern Dress, 8 J. Pub. L. 381, 381 (1959)).
Â Â Â Â Â Â Â Â Â Â Â Â We hold Romero's right of confrontation was improperly infringed.
Presumption of Innocence
Â Â Â Â Â Â Â Â Â Â Â Â We also hold his presumption of innocence was unduly compromised. The guarantee of due
process under the Fourteenth Amendment includes the right to a fair trial, and basic to this right is
the presumption of a defendant's innocence. Marx, 987 S.W.2d at 581 (citing Holbrook v. Flynn,
475 U.S. 560 (1986)). "To implement the presumption, courts must be alert to factors that may
undermine the fairness of the fact-finding process," and, "[i]n the administration of criminal justice,
courts must carefully guard against dilution of the principle that guilt is to be established by
probative evidence and beyond a reasonable doubt." Id. (quoting Estelle v. Williams, 425 U.S. 501,
503 (1976)). For this reason, Romero not only argues his right to face-to-face confrontation was
violated by Vasquez being permitted to testify in disguise, but also contends he was denied the right
to a fair trial by Vasquez's testifying in disguise, making Romero appear guilty and eroding the
presumption of innocence. 
Â Â Â Â Â Â Â Â Â Â Â Â The Texas Court of Criminal Appeals has written that, if a particular practice at trial "tends
to brand the defendant with an unmistakable mark of guilt," it impairs the presumption of innocence
in violation of the Due Process Clause. Id. (citing Holbrook, 475 U.S. at 570â71). "If, on the other
hand, the challenged practice need not be interpreted by jurors as a sign that the defendant is
particularly dangerous or culpable, it is not inherently prejudicial and does not deny due process." 
Id. The question we must address, therefore, is whether Vasquez's disguiseâinsisted on because
of his fear of retaliationâimproperly communicated to the jury that Romero was, in fact, dangerous
or culpable.
Â Â Â Â Â Â Â Â Â Â Â Â Courts addressing this issue in the past have indicated that "reason, principle, and common
human experience" must guide the determination of whether a particular practice is presumptively
prejudicial. Holbrook, 475 U.S. at 569; Estelle, 425 U.S. at 504; Marx, 987 S.W.2d at 581. That
is, courts must ask whether the scene presented to jurors was so inherently prejudicial as to pose an
unacceptable threat to the defendant's right to a fair trial. Holbrook, 475 U.S. at 572. If it is equally
probable that jurors will infer from the particular practice at issue some meaning other than the one
suspected by the defendant, then the answer to this question is no. Depending on the circumstances
of the case, another possibility is that jurors will infer nothing at all from the questioned practice. 
See id. at 569.
Â Â Â Â Â Â Â Â Â Â Â Â In Holbrook, for example, the United States Supreme Court was required to examine whether
the presence of four uniformed state troopers sitting directly behind the defendant was so inherently
prejudicial that the defendant was denied the right to a fair trial. Id. at 570. Reasoning there were
multiple, relatively harmless inferences that could have been made from the officers' presence in the
courtroom, the Court ultimately concluded the defendant's rights were not unacceptably threatened. 
Id. at 572. In Marx, the Texas Court of Criminal Appeals reached the same conclusion when
considering the prejudicial effect of a child witness testifying outside the defendant's presence via
two-way closed circuit television. Marx, 987 S.W.2d at 582. Noting the trial court's instruction that
such procedures were authorized "in these types of cases," the court agreed that "the instruction
likely conveyed to the jury the state's general desire to protect children from the intimidating
courtroom environment rather than implying the procedure was necessary because of the defendant's
guilt." Id. at 581.
Â Â Â Â Â Â Â Â Â Â Â Â Unlike the situations presented in Holbrook and Marx, however, permitting a disguised
Vasquez to testify against Romero added an unnecessary element of drama, placed unwarranted
emphasis on Vasquez's testimony, and may have unfairly prejudiced the jury against Romero. The
trial court's failure to instruct the jury regarding Vasquez's appearance only compounded the problem
because the defendant was left in the awkward position of trying to minimize any potential harm by
asking Vasquez, in the jury's presence, why he was dressed as he was and then attempt to
demonstrate through his testimony why his fears were unfounded. Although it is impossible for this
Court to determine the likely damage caused by Vasquez's testifying in disguise or the weight
individual jurors may have attributed to his appearance, it posed an unacceptable threat to Romero's
right to a fair trial.
Charge Error
Â Â Â Â Â Â Â Â Â Â Â Â Having determined that Romero's constitutional rights under the Sixth and Fourteenth
Amendments were violated, we need not reach his third point of error alleging charge error at
punishment.
Â 
Â 
Conclusion
Â Â Â Â Â Â Â Â Â Â Â Â Recognizing that the protections afforded by the Confrontation Clause are not absolute, a
defendant's right to face-to-face confrontation may be abridged only "where denial of such
confrontation is necessary to further an important public policy and only where the reliability of the
testimony is otherwise assured." Craig, 497 U.S. at 849â50. Satisfaction of this general standard
requires more than a mere showing that public policy would be served; instead, it demands that trial
courts make case-specific findings of necessity, justifying the infringement of a defendant's right to
confront his or her accusers face to face. In the absence of such a finding of necessity by the trial
court, we hold Romero's right to confrontation was unjustifiably violated when Vasquez was
permitted to testify in disguise. We also hold that permitting Vasquez to testify in this manner
eroded the presumption of innocence, depriving Romero of the right to due process.
Â Â Â Â Â Â Â Â Â Â Â Â As we are unable to conclude beyond a reasonable doubt that these violations did not
contribute to Romero's conviction or punishment, we reverse the trial court's judgment and remand
this case to the trial court for further proceedings.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Josh R. Morriss, III
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice

Date Submitted:Â Â Â Â Â Â Â Â Â Â March 11, 2004
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â April 27, 2004

Publish



 for the jury, in which M.L. implicated
Halbrook.  HalbrookÂs counsel objected to
EhrhartÂs testimony and police car video of the interview, alleging that they
were hearsay and that ÂM.L. testified the first adult she told was her uncle.ÂÂ Â  

Â Â Â Â Â Â Â Â Â Â Â  If a Âstatement
about the offenseÂ alleged is made by a victim under fourteen years of age, Âthe
first person, 18 years of age or older,Â to whom the statement was made may
testify about the victimÂs statements at trial. Â Tex.
Code Crim. Proc. Ann. art. 38.072, Â§ 2 (Vernon Supp. 2009).Â  Testimony of such an outcry witness is an
exception to the hearsay rule.Â  Padilla v. State, 278 S.W.3d 98, 107
(Tex. App.ÂTexarkana 2009, pet. refÂd).Â  

Â Â Â Â Â Â Â Â Â Â Â  In this
case, direct examination of M.L. produced the following:

Â 

Q.Â Â Â Â Â Â Â  Did
you ever talk to anyone like your mom or a police officer or the judge?Â  

Â 

A.Â Â Â Â Â Â Â  I
told the police officer . . . .

Â 

Q.Â Â Â Â Â Â Â  Had
you ever told your mama before you told the policeman?

Â 

A.Â Â Â Â Â Â Â  Yeah.


Â 

Q.Â Â Â Â Â Â Â  You
told her. 

Â 

A.Â Â Â Â Â Â Â  She
was there. 

Â 

Q.Â Â Â Â Â Â Â  She
was there and heard you tell the policeman.Â 
But before that night had you ever told your mama what Donny was doing
to you?

Â 

A.Â Â Â Â Â Â Â  No.


Â 

Q.Â Â Â Â Â Â Â  Before
you told the policeman, did you tell any other adults?

Â 

A.Â Â Â Â Â Â Â  My
uncle.Â  

Â 

Q.Â Â Â Â Â Â Â  You
told your uncle.Â  Was he there with the
policeman too?

Â 

A.Â Â Â Â Â Â Â  IÂm
not really sure.Â  I forgot.Â  

Â 

The following exchange occurred during cross-examination:

Â 

A.Â Â Â Â Â Â Â  .
. . That was my uncle that I told. 

Â 

Q.Â Â Â Â Â Â Â  Oh,
your Uncle John. 

Â 

A.Â Â Â Â Â Â Â  No.Â  HeÂs out in the hall. 

Â 

Q.Â Â Â Â Â Â Â  Okay.Â  And you told him something before,
right?Â  Before you told the officer?

Â 

Â Â Â Â Â Â Â Â Â Â Â  (Shakes
head in the affirmative). 

.Â  

Â Â Â Â Â Â Â Â Â Â Â  The
evidence establishes that some statement by M.L. was made to the uncle before
the statements made to Ehrhart.Â  However,
the Texas Court of Criminal Appeals has interpreted Article 38.072 of the Texas
Code of Criminal Procedure to require that the previous statement be one which Âin
some discernible manner describes the alleged offense.ÂÂ  Garcia
v. State, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990).Â  It must be Âmore than words which give a
general allusion that something in the area of child abuse was going on . . . .
Â The statute demands more than a general
allusion of sexual abuse.ÂÂ  Id.; see
also Thomas v. State, 1 S.W.3d 138, 140Â41 (Tex. App.ÂTexarkana 1999, pet.
refÂd). 

Â Â Â Â Â Â Â Â Â Â Â  ÂTrial
courts are afforded broad discretion in determining the admissibility of outcry
statements, and the decision to admit such evidence will not be disturbed
absent a clear abuse of that discretion.Â Â Harvey
v. State, 123 S.W.3d 623, 627 (Tex. App.ÂTexarkana 2003, pet. refÂd) (citing Garcia, 792 S.W.2d at 92). Â We will not substitute our judgment for that
of the trial court unless it acted in an arbitrary or unreasonable manner,
without reference to any guiding rules or principles. Â Id. (citing Montgomery v. State, 810 S.W.2d 372,
380 (Tex. Crim. App. 1990)).Â  

Â Â Â Â Â Â Â Â Â Â Â  From M.L.Âs
testimony, while it appears that Ehrhart was not the first person over eighteen
whom she told about Âwhat Donny was doingÂ to her, there is nothing in the
record suggesting M.L.Âs statements to her uncle described the alleged offense
in some discernible manner.Â  In contrast,
the record establishes M.L.Âs discernible statement to Ehrhart.Â  In Garcia,
the child complainant made general statements of abuse to her teacher.Â  792 S.W.2d at 91.Â  From the record, the court was unable to
determine Âwhat it was the complainant told her teacher.ÂÂ  Id. Â Garcia found
that where the State laid Âa proper predicate that [a child protective
specialist] was the outcry witness,Â and Âthe defense had ample opportunity to
recall [the teacher] in an attempt to rebut this predicate, but failed to do
so,Â and did not Âelicit testimony from the complainant regarding the specifics
of the statements she made to [the teacher],Â the trial court was within its
discretion to consider the child protective specialist as the proper outcry witness.Â  Id. at
91Â92.Â  Similarly, in this case, the
defense had the ability to call the uncle who Âwas out in the hall,Â or recall
M.L. in order to clarify the statements she made to him.Â Â  Because the defense failed to do so, we find
the trial court was within its discretion in finding Ehrhart to be the proper
outcry witness.Â  See In re Z.L.B., 102 S.W.3d 120, 122Â23 (Tex. 2003) (Âdefendant in
this case had the burden to introduce evidence that J.M.Âs statement to his
mother was more than just a general allusion to abuseÂ).Â  We overrule this point of error. 

Â Â Â Â Â Â Â Â Â Â Â  Halbrook
also argues that the trial court erred by failing to conduct a hearing outside
the presence of the jury to determine if the statement given to Ehrhart was
reliable.Â  Tex. Code Crim. Proc.
Ann. art. 38.072, Â§ 2(b)(2).Â  The State has the burden to comply with the
terms of the statute, and the trial court is required to determine the
statement is reliable after a hearing conducted outside the presence of the
jury. Â Id. Â The provisions of the statute
are mandatory and must be satisfied.Â  Long v. State, 800 S.W.2d 545, 547 (Tex.
Crim. App. 1990).Â Â  An issue that has
split some of the courts of appeals is whether a more specific objection than ÂhearsayÂ
is required to preserve argument that a section of the statute has been
violated (lack of notice, failure to conduct hearing, etc.).Â Â  Zarco
v. State, 210 S.W.3d 816, 828 (Tex. App.ÂHouston [14th Dist.] 2006, no
pet.) (compilation of Texas opinions on this issue).Â Â  We believe the Texas Court of Criminal
Appeals has definitively resolved this issue in Long when it held that Long preserved error by his hearsay
objection and therefore was allowed to argue that the trial court failed to
conduct a hearing to determine if the statement was reliable as required by the
statute.Â  Long, 800 S.W.2d at 548.Â Â  We agree with the holding in Zarco, Âwe will follow the Court of
Criminal AppealsÂ binding precedentÂ . . . . ÂÂ  This argument is preserved for our
consideration. 

Â Â Â Â Â Â Â Â Â Â Â  Here, during
EhrhartÂs testimony, the trial court conducted a hearing outside the presence
of the jury to determine the admissibility of a video recording of a ten-minute
portion of the childÂs statement.[3]Â  This procedure necessarily involved a review
of the childÂs statement and was more extensive than EhrhartÂs abbreviated
report of the childÂs statement.Â  The State
argued the video recording would show Âthe actual scene when the officer
responds and it shows the layout of the area, how they talked to everybody, what
was said.ÂÂ  A bench conference has been
found to fulfill the requirements of the statute.Â  Zarco,
210 S.W.2d at 831.Â  We find that this
review by the trial court satisfied the hearing requirement; by overruling the
objection, the trial court impliedly found the statement given to the officer
and recorded on the videotape was reliable.Â 
Id. 

III. Â Â Â Â  Conclusion 

Â 

Â Â Â Â Â Â Â Â Â Â Â  We affirm the judgment of the
trial court. 

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Jack
Carter

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  July
8, 2010Â Â Â Â  

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  July
28, 2010

Â 

PublishÂ Â Â Â Â Â Â Â Â Â Â  

Â 











[1]Halbrook
was also convicted of two counts of aggravated sexual assault and four counts
of indecency with his then eight-year-old daughter, M.B.Â  Although Halbrook filed a single brief
addressing points of error presented in this case and companion cause number
06-09-00204-CR, which were tried together, we address each case separately
since certain points of error apply only to one case or the other.Â  





[2]Halbrook
argues that M.L. failed to identify him during trial.Â  It is clear that M.L. looked at a picture of
Halbrook and identified him as ÂDonny.ÂÂ  





[3]The
hearsay objection was only that the officerÂs testimony and the video recording
were not admissible because Âthe first person outcry was made to the uncle.Â