In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00120-CR


______________________________




DOUGLAS GARDNER VANHOOSER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 71st Judicial District Court


Harrison County, Texas


Trial Court No. 05-0403X




 




Before Morriss, C.J., Ross and Carter, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 Charged with driving while intoxicated (D.W.I.), Douglas Gardner VanHooser appeared in
the trial court on Monday, May 7, 2006, at which time a jury was selected and empaneled, the
indictment was read, VanHooser's plea of "not guilty" was received, and the trial court announced
that trial would begin at 9:00 a.m., May 9. At the announced time, trial did begin, but VanHooser
was absent.

 The jury found VanHooser guilty and found that he had twice previously, finally, and
sequentially been convicted of D.W.I. The trial court sentenced VanHooser to ten years'
imprisonment and a $10,000.00 fine, in accordance with the jury's punishment verdict. VanHooser
now appeals, raising two points of error. We affirm because we hold that (1) denying VanHooser's
motion for continuance was not error, and (2) VanHooser's issue claiming denial of a fair and
impartial trial is multifarious and should be overruled as such.

(1) Denying VanHooser's Motion for Continuance Was Not Error

 VanHooser first contends the trial court erred by denying his motion for continuance. When
the trial court called the case for trial on Wednesday, VanHooser was not present. The trial court
asked VanHooser's counsel if he had received any contact from the defendant, and counsel responded
that he had not. The trial court sent the bailiff to look elsewhere for VanHooser, but the defendant
could not be located. VanHooser's counsel requested a continuance, which the trial court denied. 
In overruling that request, the trial court stated,

The record should reflect that on Monday we picked the jury and I was concerned
about Mr. VanHooser's desire to return based on observations in the courtroom and
so I had the indictment read and took his plea and it would be the court's position that
the Motion for Continuance be denied. And that we will try him and he can join you
when he gets here.

The trial court then asked if VanHooser's counsel was prepared to proceed with cross-examination
of the State's witnesses. Counsel responded affirmatively, and trial began. 

 A trial court's ruling on a motion for continuance is reviewed for an abuse of discretion. 
Heiselbetz v. State, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995); Hart v. State, 173 S.W.3d 131,
138 (Tex. App.--Texarkana 2005, no pet.). To demonstrate that the trial court abused its discretion,
"there must be a showing the defendant was actually prejudiced by the denial of the motion." Hart,
173 S.W.3d at 138. If an accused voluntarily absents himself or herself after pleading to the
indictment, or if he or she does so after the jury has been sworn, the trial may proceed to conclusion
without the defendant's presence. Tex. Code Crim. Proc. Ann. art. 33.03 (Vernon 2006).

 The State contends VanHooser failed to preserve this issue for our review because counsel's
motion for continuance was made orally without a written, sworn motion. "A motion for
continuance not in writing and not sworn preserves nothing for review." Dewberry v. State, 4
S.W.3d 735, 755 (Tex. Crim. App. 1999) (referencing Tex. Code Crim. Proc. Ann. arts. 29.03,
29.08 (Vernon 2006)). The State is correct: because defense counsel's motion was made orally,
without a written and sworn motion, the alleged error has not been preserved for appellate review.

 Yet, even if this issue had been preserved, the record before us does not support the
conclusion that the trial court abused its discretion by denying the requested continuance based on
VanHooser's absence from trial. In Heard v. State, this Court visited the issue of whether a trial
court erred by trying an accused in absentia under Article. 33.03 of the Texas Code of Criminal
Procedure. 887 S.W.2d 94, 96-97 (Tex. App.--Texarkana 1994, pet. ref'd). In that case, a jury was
selected and empaneled the week preceding a trial on guilt/innocence. When the trial court called
the case for trial the following week, Heard was nowhere to be found. Heard's brothers searched for
him in parts of Texas, Arkansas, and Louisiana; Heard's bondsman searched for him; and the local
hospitals were checked--all without success. It turned out that Heard was absent from trial because
he had been intoxicated the night before trial and had apparently "forgotten" that trial was to take
place the following day. This Court determined that Heard's state of intoxication was not sufficient
evidence to establish that his absence was "involuntary" for purposes of Article 33.03. Accordingly,
this Court concluded no abuse of discretion had been shown. Id. at 96-99.

 In the current case, VanHooser claimed at his subsequent sentencing (held May 22, 2006)
that his absence at the May 9 trial was a result of oversleeping. VanHooser told the court that, once
he realized he was late for court, he panicked and did not know what to do. Continuing, he stated, 

As I told the gentleman here. I stayed away a couple of days and I came back on
Friday, actually Thursday night and spent the night with my wife and got up the next
day and tried to get a lawyer and that is when I saw the officer and I just didn't know. 
I was never running. And I know that y'all weren't going to believe.


The trial court responded that it had "seen the offense report where they picked you up in Lancaster." 
VanHooser's appellate counsel now asks us to look to VanHooser's proffered excuse of
"oversleeping"--given nearly two weeks after the trial court denied counsel's motion for
continuance--as evidence that VanHooser's absence at trial was unintentional and that, therefore,
the trial court erred in denying the requested continuance.

 We disagree with such an assessment of the record. Our reading of the record suggests only
that VanHooser's continued absence from the proceedings below was voluntary. VanHooser made
several conscious decisions to stay away from the Harrison County proceedings: (1) when he
awakened and decided not to contact his attorney, (2) when he failed to present himself in the trial
court at the soonest possible moment following his realization that he was missing his trial, (3) when
he made the decision to "stay away a couple of days" from the proceedings, (4) when those "couple
of days" turned into nearly two weeks of absence, (5) when he continued to not contact his bondsman
or attorney, and (6) when he only finally returned to Harrison County following his arrest in the
Dallas area. We conclude there is nothing in the record to support a conclusion that VanHooser's
continued absence from trial was anything but voluntary. No abuse of discretion has been shown. (1) 
We overrule VanHooser's first point of error.

(2) VanHooser's Issue Claiming Denial of a Fair and Impartial Trial Is Multifarious and Should 
 Be Overruled as Such

 In a single point of error, VanHooser next contends the trial court made several rulings, the
cumulative effect of which was to deny VanHooser a fair trial guaranteed him by the United States
and Texas Constitutions. VanHooser argues the trial court erroneously (1) prompted the State to
read the jurisdictional enhancement provisions of the indictment after the State had initially failed
to do so, (2) denied counsel's motion for continuance, (3) allowed the State to reopen its case-in-chief--over the defense's objection--to present evidence to support the indictment's jurisdictional
enhancement paragraphs, (4) permitted the State to call a person who had not been listed as a
potential witness, and (5) admitted a State's exhibit for which the proper predicate had not been laid. 
VanHooser contends the cumulative effect of these errors was that the trial court was assisting the
State in prosecuting its case, conduct which thereby denied VanHooser a fair and impartial trial
under the United States and Texas Constitutions. 

 "Attorneys, when briefing constitutional questions, should carefully separate federal and state
issues into separate grounds and provide substantive analysis or argument on each separate ground. 
If sufficient distinction between state and federal constitutional grounds is not provided by counsel,
this Court may overrule the ground as multifarious." Luquis v. State, 72 S.W.3d 355, 364 n.21 (Tex.
Crim. App. 2002) (quoting McCambridge v. State, 712 S.W.2d 499, 501-02 n.9 (Tex. Crim. App.
1986)); see also Foster v. State, 101 S.W.3d 490, 499 (Tex. App.--Houston [1st Dist.] 2002, no pet.)
(overruling issue as multifarious that attacked cumulative effect of three separate trial court rulings
as denying presumption of innocence).

 VanHooser's second point of error makes no effort to distinguish between the federal and
state constitutional issues. This second point is multifarious, and we overrule it as such.

 For the reasons stated, no reversible error has been shown. We affirm the trial court's
judgment.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: October 26, 2006

Date Decided: November 3, 2006


Do Not Publish


1. Cf. Heard, 887 S.W.2d at 96-99; Schmitt v. State, No. 12-01-00306-CR, 2003 Tex. App.
LEXIS 9009 (Tex. App.--Tyler Oct. 22, 2003, no pet.) (mem op., not designated for publication)
(trial court had sufficient facts before it to decide accused voluntarily absented himself when court
sent deputies to search courthouse, where counsel had received no contact from accused, and where
accused apparently returned to court the next day only after being arrested); and Vasquez Mata v.
State, No. 13-01-00743-CR, 2002 Tex. App. LEXIS 5631 (Tex. App.--Corpus Christi Aug. 1, 2002,
no pet.) (mem. op., not designated for publication) (no evidence accused's medical condition
prevented her attendance at trial when record showed she was released from hospital before trial
resumed). 


tyle="font-family: 'Times New Roman', serif">V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 179th Judicial District Court
Harris County, Texas
Trial Court No. 911610


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N

            When subpoenaed State's witness, Cesar Hiran Vasquez, appeared at Israel G. Romero's
aggravated assault trial wearing dark sunglasses, a baseball cap pulled low over his eyes, and a jacket
with an upturned collar, leaving visible only Vasquez's ears, the tops of his cheeks, and the bridge
of his nose, the trial court, over defense counsel's objection, allowed Vasquez to testify in the
"disguise." We must decide whether that violated Romero's rights under the Confrontation and Due
Process Clauses. We hold it did.
            Romero was indicted for aggravated assault after a May 2002 shooting incident outside a
Harris County nightclub. On the first day of trial, it became clear one of the State's witnesses,
Vasquez, was reluctant to testify. Although Vasquez was in the building, he simply refused to enter
the courtroom even after the trial court ordered him to pay a $500.00 fine for refusing to comply with
the State's subpoena. Vasquez finally entered the courtroom—sometime between one and a half to
three hours after arriving at the courthouse—only after the State agreed he could testify in his
disguise. 
            When Vasquez entered dressed in his disguise, and while still outside the presence of the
jury, Romero's counsel objected to Vasquez's appearance, arguing he should not be permitted to
testify in disguise on the grounds that it would be highly prejudicial and a violation of Romero's
constitutionally protected rights. Although Vasquez stated he was afraid to testify against Romero
because he had witnessed how dangerous Romero could be and feared Romero would seek revenge,
he admitted he had neither seen Romero since the incident nor been threatened by Romero in any
way. Nevertheless, citing his own safety, Vasquez maintained he would not testify in front of
Romero without being able to wear his disguise. 
            After hearing both Romero's and the State's arguments on the issue, and without further
commenting on its ruling, the trial court simply stated it would allow Vasquez to testify as he was. 
At the close of the evidence, including Vasquez's eyewitness testimony, the jury found Romero
guilty of aggravated assault and assessed punishment at ten years' confinement. Romero now
appeals, contending the trial court erred by (1) allowing Vasquez to testify in disguise, violating
Romero's  rights  to  confront  one  of  the  State's  witnesses  and  to  be  presumed  innocent,  and
(2) admitting evidence of an unadjudicated extraneous offense during the punishment phase of the
trial. Right to Confrontation
            Applicable to the states through the Due Process Clause, Pointer v. Texas, 380 U.S. 400,
403–06 (1965), the Confrontation Clause provides that "[i]n all criminal prosecutions, the accused
shall enjoy the right . . . to be confronted with the witnesses against him," U.S. Const. amend. VI. 
Normally, the right to confront one's accuser is satisfied if defense counsel is given wide latitude to
question an adverse witness; but the Confrontation Clause provides a criminal defendant not only
the right to cross-examination, but also the right to physically face those who testify against him. 
Pennsylvania v. Ritchie, 480 U.S. 39, 51–53 (1987). Romero contends the latter right was violated.
            Addressing a similar issue in Coy v. Iowa, 487 U.S. 1012 (1988), the United States Supreme
Court reversed and remanded a decision allowing two child witnesses to testify behind a large screen
separating them from the defendant accused of sexually abusing them. Noting there has never been
any doubt "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses
appearing before the trier of fact," the Court pointed out "there is something deep in human nature
that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a
criminal prosecution.'" Id. at 1016–17 (quoting Pointer, 380 U.S. at 404). Considering that this
concept "traces back to the beginnings of Western legal culture," the Court found it interesting that
the phrase "Look me in the eye and say that" still persists and bears considerable significance. Id.
at 1015, 1018. With this understanding, "the right of confrontation 'contributes to the establishment
of a system of criminal justice in which the perception as well as the reality of fairness prevails.'" 
Id. at 1018–19 (quoting Lee v. Illinois, 476 U.S. 530, 540 (1986)).
            Unlike the present case in which a witness concealed his face from the defendant, judge, and
jury, the screen employed in Coy was designed to enable the defendant to dimly perceive the
complaining witnesses, at the same time lessening the witnesses' unease by blocking the defendant
from their view. Id. at 1014–15, 1020. Under those circumstances, the Court stated: "It is difficult
to imagine a more obvious or damaging violation of the defendant's right to a face-to-face
encounter." Id. at 1020. The violation in this case is worse than in Coy because Vasquez's disguise
was aimed at blocking not his view of Romero, but Romero's view of him.
The Confrontation Clause does not, of course, compel the witness to fix his eyes
upon the defendant; he may studiously look elsewhere, but the trier of fact will draw
its own conclusions. Thus the right to face-to-face confrontation serves much the
same purpose as a less explicit component of the Confrontation Clause that we have
had more frequent occasion to discuss—the right to cross-examine the accuser; both
"ensur[e] the integrity of the factfinding process."

Id. at 1019–20 (quoting Kentucky v. Stincer, 482 U.S. 730, 736 (1987)). While the Coy Court
conceded that "rights conferred by the Confrontation Clause are not absolute, and may give way to
other important interests," it declined to identify any such exception because there were no
individualized trial court findings that the witnesses in that case needed special protection. Id. at
1020–21. In Maryland v. Craig, 497 U.S. 836 (1990), the Supreme Court was once again asked to
address a defendant's right to confront adverse witnesses face to face. This time, however, in light
of the trial court's individualized findings that the child witness involved needed special protection,
the Court was required to decide the question reserved in Coy. Id. at 845. Specifically, the Court
had to determine whether the Confrontation Clause "categorically prohibits a child witness in a child
abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by
one-way closed circuit television." Id. at 840.
            Citing its earliest case interpreting the Confrontation Clause, the Court in Craig stated the
clause's primary purpose was to prevent depositions or ex parte affidavits from being used against
a defendant in lieu of testimony subject to cross-examination. Cross-examination in the physical
presence of the accused allows the accused not only to test the recollection and sift the conscience
of the witness, but also to compel him or her "to stand face to face with the jury in order that [its
members] may look at him, and judge by his demeanor upon the stand and the manner in which he
gives his testimony whether he is worthy of belief." Id. at 845 (quoting Mattox v. United States, 156
U.S. 237, 242–43 (1895)). The Confrontation Clause, therefore,
(1) insures that the witness will give his statements under oath—thus impressing him
with the seriousness of the matter and guarding against the lie by the possibility of
a penalty for perjury; (2) forces the witness to submit to cross-examination . . . ; [and] 

(3) permits the jury that is to decide the defendant's fate to observe the demeanor of
the witness in making his statement, thus aiding the jury in assessing his credibility.




Id. at 845–46 (quoting California v. Green, 399 U.S. 149, 158 (1970)) (emphasis added).
            Reiterating the position taken in Coy, the Court explained that a defendant's right to face-to-face confrontation is not absolute. Id. at 849–50. Nevertheless, the requirement may not easily be
dispensed with because "a defendant's right to confront accusatory witnesses may be satisfied absent
a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary
to further an important public policy and only where the reliability of the testimony is otherwise
assured." Id. Ultimately, the facts presented in Craig indicated that all of the other elements of the
right to confrontation were met because the Maryland statute permitting testimony via one-way
closed circuit television also (1) required child witnesses to be competent to testify, doing so under
oath; (2) allowed the defendant the opportunity for contemporaneous cross-examination; and
(3) enabled the judge, jury, and defendant to view the demeanor (and body) of the testifying witness. 
Id. at 851.
            Even with these assurances, however, weighing the State's transcendent interest in protecting
the physical and emotional welfare of children against the Confrontation Clause's "preference" for
face-to-face confrontation is not enough. See id. at 849–50; Coy, 487 U.S. at 1024–25 (O'Connor,
J., concurring). In fact, although the Court upheld the Maryland statute at issue in Craig, it did so
because the State made an adequate showing, and the trial court made a case-specific finding, of
necessity, evidencing the trauma that would be caused by compelling the particular child witness in
that case to confront her alleged abuser.


 Craig, 497 U.S. at 855.
            A number of dissimilarities between Craig and the present case demonstrate the violation
of Romero's constitutional right to confront, face to face, one of the witnesses against him. First, the
procedure discussed in Craig, which was designed to lessen the witness' trauma from testifying in
the physical presence of the defendant, still enabled the judge, jury, and defendant to view the
demeanor of the witness as she testified. Id. at 851. "[M]indful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding," id., we note that, although
Vasquez's disguise did not remove him from the physical presence of the defendant, neither the
defendant nor the trier of fact was fully able to "look at him, and judge by his demeanor upon the
stand and the manner in which he [gave] his testimony whether he [was] worthy of belief," Mattox,
156 U.S. at 243. Second, the State's interest in protecting child witnesses from the trauma of
testifying in a child abuse case was held to be "sufficiently important to justify the use of a special
procedure that permits a child witness in such cases to testify . . . in the absence of face-to-face
confrontation with the defendant." Craig, 497 U.S. at 855. In the present case, the State failed to
identify any such interest, and Vasquez is an adult. Third, even if the State had identified an interest
sufficiently important to justify abridging Romero's right to confront Vasquez, unlike the situation
in Craig, the trial court failed to make any case-specific findings of necessity. See id. at 855–58. 
Considering the facts of this case, Romero's right to confrontation was unjustifiably violated, absent
a finding of necessity, when Vasquez testified in disguise.
            We note only one other case that has addressed a similar issue. In People v. Morales, 666
N.Y.S.2d 410, 411 (N.Y. App. Div. 1998) [hereinafter Morales I] (emphasis added), New York's
Appellate Division, First Department, determined that a defendant "was not denied his right of
confrontation . . . when a witness for the prosecution was permitted to testify while wearing
sunglasses, at her insistence, for purposes of disguise. . . . [because] the procedure was justified by
the necessities of the case." When the New York Court of Appeals denied leave to appeal, People
v. Morales, 695 N.E.2d 724 (N.Y. 1998), the defendant thereafter filed a habeas corpus petition in
federal district court, which was ultimately denied (and affirmed on appeal) because the
Confrontation Clause claim was insufficient to provide a basis for habeas relief. Morales v. Artuz,
No. 98 Civ. 6558, 2000 U.S. Dist. LEXIS 16405 (S.D.N.Y. 2000) [hereinafter Morales II], aff'd, 
281 F.3d 55 (2d Cir. 2002) [hereinafter Morales III], cert. denied, Morales v. Greiner, 537 U.S. 836
(2002).



            These courts reached their decisions, at least in part, after determining the trial court properly
concluded the witness' disguise was justified by the necessities of the case. Morales I, 666 N.Y.S.2d
at 411; Morales II, 2000 U.S. Dist. LEXIS 16405, at *12–14; Morales III, 281 F.3d at 57–58. In
Morales I,
[t]he trial judge found, after hearing the witness's explanation and observing her
demeanor and after extensive discussion with counsel, that [she] had a real and
justified fear of testifying. The court noted that it was apparent [the witness] would
not testify without the sunglasses and that she was prepared to defy the court's order. 
The court found that she was terrified of the defendant. In order to obtain what the
trial judge viewed as testimony "extremely relevant and material to the guilt or
innocence of the defendant," he determined that it was "necessary" to allow her to
testify with the sunglasses. Moreover, permitting [the witness] to wear sunglasses
while testifying is a relatively modest imposition on the right to face-to-face
confrontation that the trial court properly found was justified by the necessities of the
case. Thus, the trial court identified the correct legal rule and determined that [the
witness] could wear her sunglasses. This finding was not "contrary to" or an
objectively unreasonable application of Coy and Craig's Confrontation Clause
doctrine.

Morales II, 2000 U.S. Dist. LEXIS 16405, at *12–13 (explaining the balancing of interests in
Morales I) (citations omitted). In the present case, however, no such finding of necessity was made. 
The record, in fact, reveals two instances where the trial court mentioned the issue, but contains
neither an explanation for overruling Romero's objections nor a finding to support that ruling.


 There appears in the record no balancing of the State's interest in obtaining evidence "extremely relevant
and material to the guilt or innocence of the defendant" against the "imposition on the right to face-to-face confrontation," as did the New York courts, Morales II, 2000 U.S. Dist. LEXIS 16405, at
*12–13. We find only the trial court's statement, "I'm going to allow the witness to testify in shades,
a ball cap, and with his collar turned up." 
            In a situation more similar to the one presented in Craig, the Texas Court of Criminal
Appeals reiterated that "a defendant's right to confront accusatory witnesses may be satisfied absent
a physical, face-to-face confrontation at trial only when denial of such confrontation is necessary to
further an important public policy and the reliability of the testimony is otherwise assured." Marx
v. State, 987 S.W.2d 577, 580 (Tex. Crim. App. 1999) (citing Craig, 497 U.S. at 850–51). There,
the trial court's decision to allow two child witnesses to testify via two-way closed circuit television
avoided violating the Confrontation Clause because the court explicitly found, as a matter of fact,
that the special procedure was necessary to protect the children from the emotional trauma of having
to testify in the defendant's physical presence. Id. The court went on to state that "the requisite
reliability of the children's testimony was assured because they testified after promising to do so
truthfully, they were subject to cross-examination, and the jury was able to observe their demeanor." 
Id. at 581 (emphasis added).
            Even if the trial court had made a case-specific finding of necessity, we doubt that, under
the circumstances, allowing an adult witness to substantially conceal his or her face while testifying
in a criminal trial would pass constitutional muster. The three assurances of reliability mentioned
in the preceding paragraph's discussion of Marx are the same constitutional guarantees identified in
Mattox and Green and re-emphasized in Craig. That is, in addition to ensuring that a witness gives
his or her statements under oath and requiring the witness to submit to cross-examination, the
Confrontation Clause also ensures that the trier of fact will be permitted to observe the witness'
demeanor, aiding in the assessment of his or her credibility. Craig, 497 U.S. at 845–46; Green, 399
U.S. at 158; Mattox, 156 U.S. at 242–43.
            While the validity of demeanor evidence in assessing witness credibility has been questioned,
see, e.g., Morales III, 281 F.3d at 61 nn.3–4, it is clear that such evidence is deeply rooted in our
legal culture and tradition, and the Supreme Court's opinions relating to this matter provide no
indication that a break with precedent is forthcoming. Craig, 497 U.S. at 844; Coy, 487 U.S. at
1015–20. In fact, tracing the origins of the right of confrontation to Roman law, Coy, 487 U.S. at
1015–16, the Court has repeatedly emphasized that "the irreducible literal meaning of the
[Confrontation] Clause . . . [is] 'a right to meet face to face all those who appear and give evidence
at trial,'" id. at 1021 (quoting Green, 399 U.S. at 175 (Harlan, J., concurring)), and that "it is this
literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by
the Confrontation Clause." Green, 399 U.S. at 157. It is interesting to note, therefore, that the
Second Circuit Court of Appeals downplayed the guarantee of a generalized right to face-to-face
confrontation, expressing its doubts that permitting a witness to testify in a criminal trial while
wearing dark sunglasses is contrary to constitutional law. Morales III, 281 F.3d at 62. The court
explained:
The obscured view of the witness's eyes . . . resulted in only a minimal impairment
of the jurors' opportunity to assess her credibility. Even if we accept the idea,
grounded perhaps more on tradition than on empirical data, that demeanor is a useful
basis for assessing credibility, the jurors had an entirely unimpaired opportunity to
assess the delivery of [the witness's] testimony, notice any evident nervousness, and
observe her body language. Most important, they had a full opportunity to combine
these fully observable aspects of demeanor with their consideration of the substance
of her testimony, assessing her opportunity to observe, the consistency of her
account, any hostile motive, and all the other traditional bases for evaluating
testimony. All that was lacking was the jury's ability to discern whatever might have
been indicated by the movement of her eyes.

Id. at 60–62 (citations omitted).
            Despite the court's claim that the jury had "an entirely unimpaired" opportunity to assess the
witness' demeanor apart from "whatever might have been indicated by the movement of her eyes,"
it acknowledged that this, at least, resulted in "a minimal impairment" of the jury's opportunity to
assess the witness' credibility. Id. The court itself cited a number of cases in which seeing a witness'
eyes has been explicitly mentioned as being of value in assessing credibility, and even noted other
cases in which "[s]eeing a person's eyes has . . . been deemed of value in contexts other than on the
witness stand." Id. at 60 & n.2. Nevertheless, the Second Circuit apparently concluded that any
impairment in the ability to assess the witness' demeanor due to her dark sunglasses was outweighed
by other factors available for the jury's consideration. Id. at 61–62.
            Such a balancing test between the various elements of a witness' demeanor and his or her
actual testimony to determine which of the elements may be dispensable, however, appears
unwarranted under Coy and Craig. Similar to the defendant in Morales III, for example, the
defendant in Coy was still given the opportunity to assess the delivery of testimony, notice any
evident nervousness, observe body language (albeit "dimly"), and to combine these aspects of
demeanor with the substance of the testimony itself, yet the Supreme Court determined that the use
of a one-way screen separating the witness from the defendant clearly violated that defendant's right
to a face-to-face encounter. Coy, 487 U.S. at 1020. We have no doubt that testifying in a defendant's
physical presence may "upset the truthful rape victim or abused child," but so testifying "may also
confound and undo the false accuser, or reveal the child coached by a malevolent adult." Id. In the
same vein, we recognize that a witness may feel, justifiably, intimidated or frightened by the prospect
of facing a criminal defendant accused of a violent crime, but we note also "that constitutional
protections have costs." Id. "In this country, if someone dislikes you, or accuses you, he must come
up in front. He cannot hide behind the shadow." Id. at 1018 (quoting President Eisenhower,
Address to the B'nai B'rith Anti-Defamation League (Nov. 23, 1953), quoted in Pollitt, The Right
of Confrontation: Its History and Modern Dress, 8 J. Pub. L. 381, 381 (1959)).
            We hold Romero's right of confrontation was improperly infringed.
Presumption of Innocence
            We also hold his presumption of innocence was unduly compromised. The guarantee of due
process under the Fourteenth Amendment includes the right to a fair trial, and basic to this right is
the presumption of a defendant's innocence. Marx, 987 S.W.2d at 581 (citing Holbrook v. Flynn,
475 U.S. 560 (1986)). "To implement the presumption, courts must be alert to factors that may
undermine the fairness of the fact-finding process," and, "[i]n the administration of criminal justice,
courts must carefully guard against dilution of the principle that guilt is to be established by
probative evidence and beyond a reasonable doubt." Id. (quoting Estelle v. Williams, 425 U.S. 501,
503 (1976)). For this reason, Romero not only argues his right to face-to-face confrontation was
violated by Vasquez being permitted to testify in disguise, but also contends he was denied the right
to a fair trial by Vasquez's testifying in disguise, making Romero appear guilty and eroding the
presumption of innocence. 
            The Texas Court of Criminal Appeals has written that, if a particular practice at trial "tends
to brand the defendant with an unmistakable mark of guilt," it impairs the presumption of innocence
in violation of the Due Process Clause. Id. (citing Holbrook, 475 U.S. at 570–71). "If, on the other
hand, the challenged practice need not be interpreted by jurors as a sign that the defendant is
particularly dangerous or culpable, it is not inherently prejudicial and does not deny due process." 
Id. The question we must address, therefore, is whether Vasquez's disguise—insisted on because
of his fear of retaliation—improperly communicated to the jury that Romero was, in fact, dangerous
or culpable.
            Courts addressing this issue in the past have indicated that "reason, principle, and common
human experience" must guide the determination of whether a particular practice is presumptively
prejudicial. Holbrook, 475 U.S. at 569; Estelle, 425 U.S. at 504; Marx, 987 S.W.2d at 581. That
is, courts must ask whether the scene presented to jurors was so inherently prejudicial as to pose an
unacceptable threat to the defendant's right to a fair trial. Holbrook, 475 U.S. at 572. If it is equally
probable that jurors will infer from the particular practice at issue some meaning other than the one
suspected by the defendant, then the answer to this question is no. Depending on the circumstances
of the case, another possibility is that jurors will infer nothing at all from the questioned practice. 
See id. at 569.
            In Holbrook, for example, the United States Supreme Court was required to examine whether
the presence of four uniformed state troopers sitting directly behind the defendant was so inherently
prejudicial that the defendant was denied the right to a fair trial. Id. at 570. Reasoning there were
multiple, relatively harmless inferences that could have been made from the officers' presence in the
courtroom, the Court ultimately concluded the defendant's rights were not unacceptably threatened. 
Id. at 572. In Marx, the Texas Court of Criminal Appeals reached the same conclusion when
considering the prejudicial effect of a child witness testifying outside the defendant's presence via
two-way closed circuit television. Marx, 987 S.W.2d at 582. Noting the trial court's instruction that
such procedures were authorized "in these types of cases," the court agreed that "the instruction
likely conveyed to the jury the state's general desire to protect children from the intimidating
courtroom environment rather than implying the procedure was necessary because of the defendant's
guilt." Id. at 581.
            Unlike the situations presented in Holbrook and Marx, however, permitting a disguised
Vasquez to testify against Romero added an unnecessary element of drama, placed unwarranted
emphasis on Vasquez's testimony, and may have unfairly prejudiced the jury against Romero. The
trial court's failure to instruct the jury regarding Vasquez's appearance only compounded the problem
because the defendant was left in the awkward position of trying to minimize any potential harm by
asking Vasquez, in the jury's presence, why he was dressed as he was and then attempt to
demonstrate through his testimony why his fears were unfounded. Although it is impossible for this
Court to determine the likely damage caused by Vasquez's testifying in disguise or the weight
individual jurors may have attributed to his appearance, it posed an unacceptable threat to Romero's
right to a fair trial.
Charge Error
            Having determined that Romero's constitutional rights under the Sixth and Fourteenth
Amendments were violated, we need not reach his third point of error alleging charge error at
punishment.
 
 
Conclusion
            Recognizing that the protections afforded by the Confrontation Clause are not absolute, a
defendant's right to face-to-face confrontation may be abridged only "where denial of such
confrontation is necessary to further an important public policy and only where the reliability of the
testimony is otherwise assured." Craig, 497 U.S. at 849–50. Satisfaction of this general standard
requires more than a mere showing that public policy would be served; instead, it demands that trial
courts make case-specific findings of necessity, justifying the infringement of a defendant's right to
confront his or her accusers face to face. In the absence of such a finding of necessity by the trial
court, we hold Romero's right to confrontation was unjustifiably violated when Vasquez was
permitted to testify in disguise. We also hold that permitting Vasquez to testify in this manner
eroded the presumption of innocence, depriving Romero of the right to due process.
            As we are unable to conclude beyond a reasonable doubt that these violations did not
contribute to Romero's conviction or punishment, we reverse the trial court's judgment and remand
this case to the trial court for further proceedings.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          March 11, 2004
Date Decided:             April 27, 2004

Publish