Filed 7/28/22  P. v. McFadden CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093218 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE003314) |
| v. | |
| AKEIM RASHAD MCFADDEN, | |
| Defendant and Appellant. | |

In October 2020, a jury found defendant Akeim Rashad McFadden guilty of first degree murder of George Nixon (count 1) and two counts of possession of a firearm by a person who has been convicted of a felony (counts 3-4).  On count 2, the jury found defendant not guilty of attempted murder of Eric, but found him guilty of the lesser included offense of attempted voluntary manslaughter.  The jury found that defendant

1

personally and intentionally discharged a firearm (Pen. Code, § 12022.53, subd. (d))[1] in the commission of count 1 and that he had personally used a firearm (§ 12022.5, subd. (a)) in the commission of count 2.

In a bifurcated proceeding, the court found that defendant had suffered a prior strike conviction.

In December 2020, the court sentenced defendant to a total of term of 75 years to life, plus 23 years eight months in prison: 50 years to life (25 years to life doubled for the prior strike) for count 1, plus 25 years to life for the associated firearm enhancement; 11 years (five years and six months doubled) for count 2, plus 10 years for the associated firearm enhancement; and 16 months each (eight months doubled) on counts 3 and 4.

At the time of trial, Eric was quarantined in jail because he was exhibiting symptoms consistent with the Coronavirus. On appeal, defendant contends: (1) permitting Eric to testify while wearing an N95 mask violated his constitutional right of confrontation; (2) the evidence was insufficient to sustain the jury's finding of premeditation and deliberation in connection with count 1; (3) the court was required to stay one of his sentences for possession of a firearm pursuant to section 654; and (4) resentencing is required under recent amendments to section 1170 and our Supreme Court's decision in *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*). The People offered no response to defendant's argument regarding section 654. We agree the court should have stayed one of defendant's sentences for possession of a firearm. We will remand for resentencing consistent with this opinion. In all other respects, the judgment is affirmed.

---

[1] Undesignated statutory references are to the Penal Code.

# I. BACKGROUND

## A.    *Shooting of Eric*

Eric testified that, on June 24, 2019, defendant approached him with a gun pointed at him, so he threw a crowbar at defendant, and then defendant shot him.

Eric suffered a gunshot wound to his right upper extremity and to his abdomen.

## B.    *Shooting of George*

At around 7:30 p.m. on November 18, 2019, George rode his bicycle to a clothing store named DD's.  He was there less than an hour.

The same evening, defendant sent Elizabeth a message that said, " 'Nigga G-bone bitch ass tried to set me up.  Nigga tried to pop me in front of DD's.' "

At 9:50 p.m., defendant sent his friend Kim a message that said, " 'Someone was about to try and shoot me . . . in front of DD's.' "

At about 10:00 p.m., defendant asked to borrow his friend Daniel's truck and said he had been in an altercation with someone at DD's.  Daniel heard elsewhere that G-Bone was the other person involved in the altercation.  Defendant agreed to bring the truck back by 1:00 a.m., but he did not return it until 6:30 or 7:00 a.m.

At around 2:00 a.m. on November 19, 2019, George and his girlfriend went to sleep in a tent that was zipped closed.  The tent was in Michael's grandmother's backyard.  At around 6:00 a.m., Michael heard defendant say, " 'You need to hurry up and call the ambulance, because I am going to pop this nigga G-Bone.' "  Then, Michael heard two gunshots.  George's girlfriend did not hear the shots; she woke up to George bleeding and telling her to open the tent.  It was zipped closed differently than how she had left it.

The forensic pathologist who conducted George's autopsy testified that George died from blood loss caused by a gunshot wound to the torso.  The bullet entered the groin area, penetrated the left femoral vein, passed in front of the bladder, fractured the pelvis, and lodged itself in the right buttock.  There was also a through-and-through

3

gunshot wound to George's left hand, which may have occurred because his hand was covering his groin area when he was shot.

Witnesses reported seeing defendant with a firearm in the days and weeks preceding George's murder. One of them testified that defendant said he kept the gun for protection and that if he "felt sketched, or if somebody was coming at him, he would shoot a nigga."

The People's expert on firearms and toolmark identification opined that the four cartridge cases recovered in connection with the two shootings were fired from the same firearm.

## II. DISCUSSION

A. *Testimony of Eric*

1. *Trial Court Proceedings*

On October 20, 2020, prior to opening statements, the court explained that Eric, who was to be the first witness and was in jail on an unrelated case, had been quarantined in the jail because of Coronavirus concerns: "[A]fter some back-and-forth between the court administration and the sheriff's department, they have decided they will bring him to court here this morning. But at this point we do not have a result. One, I don't know if he's had a test—a Covid-19 test, that is—and if he did, we don't have any results certainly. We don't know if he has it or not."

At that point, the court did not know why Eric had been quarantined:

"I'm trying to balance out the fact that I need to protect these 14 jurors that we brought in, plus the staff who is present, and how best to do that.

"My normal policy is to allow witnesses to come in. As long as they come in through the courthouse, they are temperature-checked downstairs. I'm sure the lawyers are also involved in making sure people are feeling okay before they come in.

4

"So we have a fairly high level of confidence that they are not exhibiting symptoms when they testify anyway, so I allow them to take off their mask because we have this plexiglass barrier.

"The barrier is only 32 inches high in front of them. The court reporter is right on the other side of that barrier. She is wearing a mask of course, and so are all the jurors.

"But I am no expert. I am about as much of an expert as everybody else is when we read these articles in the newspaper all the time. So my concern is the longer somebody potentially has the coronavirus that it can be spread in the air. The longer you are present, the more dangerous it could be.

"So I don't know how long the witness is going to take to testify. I understand it's a pretty crucial witness, but perhaps most of it will be by impeachment. So maybe this witness will not be on the stand a long time. I don't know.

"The defense would like this witness to take off their mask, and that's my general rule, but I can't see that being a very good idea if we are not sure. This person is quarantined in the jail. We are not sure whether he has this possibly. A combination of people wearing a mask—the person infected wearing a mask, and other people wearing a mask—means there is less risk."

The court was then handed a copy of an email message:

"It says apparently he was put in quarantine due to a runny nose and sore throat, self-reported. Of course, as we all have faced these same kinds of concerns in our own family, nine times out of ten it's allergies or a cold. Or it could also potentially be some sort of sign of the coronavirus. Almost everything sounds like the coronavirus when you are thinking about it all the time.

"I am not a doctor, and I am not going to weigh in on this, but it doesn't sound like there is temperature issues, respiratory issues, et cetera.

"I think out of an abundance of caution what we should do with this particular witness is leave a mask on. I talked to the sergeant from downstairs, and he said they do

5

have N95 masks, which are the better masks, that they could put on him, and that would—that, in combination with other people in this courtroom wearing a mask could very well protect everyone. This is a high level of protection, I think, there, and I think that's the thing to do.

"The other option is to have him put in a room somewhere and do this by Zoom, and have him take his mask off so that we can see him. But it's awkward to cross through Zoom sometimes. I've seen it done many times in preliminary hearings, but I've never done it for a trial.

"There has been a case up on appeal—I can't remember what district it is—that has confirmed that it's okay to have a mask on during a trial. It doesn't violate the confrontation clause. But it will always be an issue for appeal. I don't think the Third [District Court of Appeal] has heard that issue yet, so I don't know what their position is.

"So it is an issue on appeal. I am not sure if it's a big issue for appeal considering the times that we are in, but it's my opinion that I think -- he will be right here in court. I don't think it's a violation of the confrontation clause. Everybody will be able to talk to him and ask him questions. I think it's just a level of protection that we should have if he is present here in court."

Defense counsel stated that the court had fairly restated his position, which was that he preferred for Eric to be allowed to testify without a mask. When he was asked his preference between testimony over Zoom without a mask and testimony in the courtroom with a mask, defense counsel stated that he would prefer testimony in the courtroom. The court confirmed its proposed ruling that Eric would testify in court while wearing a mask, explaining it did not think it would violate the Confrontation Clause and "there is a safety risk that we owe these jurors that we've asked to come in in difficult times." The court noted the jury was not asked about this, but people generally have different levels of fear about COVID-19. "And we never know who is more vulnerable among the population. [¶] I certainly want to protect the jurors, and certainly want to protect the

6

staff here, including the defendant, myself, everybody here.  There is just a lot of unknowns about this disease, so I think the mask is the best way to ensure the safety of each."

The record reflects Eric testified with a mask on, and the jurors were told this was because there was a quarantine period when a person was brought into jail

### 2.	*Confrontation Clause*

" 'We review de novo a claim under the [C]onfrontation [C]lause that involves mixed questions of law and fact.  [Citation.]  Under this standard, we defer to the trial court's determination of "the historical facts" . . . but not the court's "application of [the] objective, constitutionally based legal test to [those] historical facts." ' " (*People v. Bharth* (2021) 68 Cal.App.5th 801, 813.)

The Confrontation Clause of the Sixth Amendment to the United States Constitution " 'provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.' " (*Coy v. Iowa* (1988) 487 U.S. 1012, 1017 (*Coy*).)

"The right to a face-to-face meeting between accused and accuser follows from the confrontation clause's 'primary object': ' "to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." ' " (*People v. Bharth, supra*, 68 Cal.App.5th at p. 814, quoting *Maryland v. Craig* (1990) 497 U.S. 836, 845 (*Craig*).)

The right to a face-to-face meeting is not absolute.  (*Craig, supra*, 497 U.S. at p. 844.)  In *Craig*, the United States Supreme Court upheld a state statute that permitted child abuse victims to testify outside the courtroom over one-way, closed-circuit

7

television when a showing was made that face-to-face testimony would be traumatic to the child. (*Id.* at pp. 840-841, 860.) The court explained that the right to a face-to-face confrontation is not violated "where denial of such confrontation is necessary to further an important public policy and . . . the reliability of the testimony is otherwise assured." (*Id.* at p. 850.) It is not settled whether this test must be satisfied every time part of a witness's face is not visible. (See *Morales v. Artuz* (2d Cir. 2002) 281 F.3d 55, 58 ["Although *Craig* and *Coy* set forth the appropriate test where the witness is physically separated from the defendant, none of the cases thus far decided by the Supreme Court deals with our precise context—a witness testifying in the presence of the defendant and the jury with a slight disguise that prevents the defendant and the jurors from seeing the witness's eyes"].) We will assume without deciding that the *Craig* test is implicated here.

As the People note, the state has an important interest in protecting the health and safety of its judges, defendants, jurors, parties, and court staff from COVID-19. (See *Roman Catholic Diocese of Brooklyn v. Cuomo* (2020) 141 S.Ct. 63, 67 (*per curiam*) ["Stemming the spread of COVID-19 is unquestionably a compelling interest"]; see also *Alabama Assn. of Realtors v. Department of Health & Humans Services* (2021) 141 S.Ct. 2485, 2490 (*per curiam*) ["It is indisputable that the public has a strong interest in combating the spread of the COVID-19 Delta variant"].) The question of whether a deviation from the constitutional " 'preference' " for face to face confrontation is necessary to protect an important interest is "a case-specific one." (*Craig, supra*, 497 U.S. at pp. 849, 855.) Here, Eric had been quarantined in jail because he was exhibiting symptoms consistent with COVID-19 in October 2020. The court was concerned that permitting him to testify without a mask on would allow the virus to spread in the air. In concluding that Eric should testify with a mask on, the court explained that it owed it to the jurors who had been asked to come to jury duty to protect their safety. The trial court further stated, "we never know who is more vulnerable among the population. [¶] I

8

certainly want to protect the jurors, and certainly want to protect the staff here, including the defendant, myself, everybody here. There is just a lot of unknowns about this disease, so I think the mask is the best way to ensure the safety of each." Defendant contends substantial evidence does not support the trial court's ruling because the court never determined whether Eric was infected and "[a] short continuance of trial would have permitted either testing for COVID-19 or continued quarantine for a week or so to see whether [Eric]'s symptoms would abate." As indicated by this argument, the record indicates no way the court could have obtained test results for the witness without a continuation of trial. We note the record does not suggest defendant was amenable to a continuation—he did not seek one. (Compare *Vazquez Diaz v. Commonwealth* (2021) 487 Mass. 336, 336-337, 350 [conducting virtual suppression hearing may be necessary to further the important public policy of protecting public health from COVID-19, but court abused its discretion in denying motion to continue until the hearing could be conducted in person].) Further, we cannot presume any continuation would have been short. (See *State v. Tate* (2022) 969 N.W.2d 378, 389-390 [necessity requirement was still met despite denial of continuance because there was no way for court to know when witness who was quarantined for COVID-19 exposure would become available].) The trial court's decision to have Eric testify with a mask on was fully justified by the record. (Compare *People v. Arredondo* (2019) 8 Cal.5th 694, 707, 709 ["the record before us is insufficient to sustain the trial court's accommodation order"; "we cannot conclude here that the accommodation was 'fully justified by the record' "], with *People v. Gonzales* (2012) 54 Cal.4th 1234, 1268 ["we conclude that the seating arrangement for the child witness's testimony was fully justified by the record"].) Thus, the trial court did not err in concluding the mask was necessary to protect the health of the jurors and the rest of the individuals present in the court room.

"Determining '[w]hether the reliability of the testimony is otherwise assured turns upon the extent to which the proceedings respect the four elements of confrontation:

9

physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.' " (*U.S. v. de Jesus-Casteneda* (9th Cir. 2013) 705 F.3d 1117, 1120; see also *People v. Gonzales, supra*, 54 Cal.4th at p. 1268 ["The seating arrangement at the preliminary hearing satisfied the central concerns of the confrontation clause: 'physical presence, oath, cross-examination, and observation of demeanor by the trier of fact' "].) Here, the first three elements were fully preserved. The fourth, demeanor, is much broader than what is conveyed by seeing a person's nose and mouth. (See *People v. Garton* (2018) 4 Cal.5th 485, 501 ["A witness's demeanor can include everything from facial expressions and hand gestures to tone and attire"].) "Demeanor includes the language of the entire body. . . . [T]he jurors . . . [were] able to see how the witness[] move[d] when [he] answer[ed] a question; [if] the witness[] hesitate[d]; how fast the witness[ spoke]. They [saw if] the witness[] blink[ed] or roll[ed his] eyes, ma[de] furtive glances, and tilt[ed] [his] head[]." (*United States v. Crittenden* (M.D. Ga. Aug. 21, 2020, No. 4:20-CR-7 (CDL)) 2020 U.S. Dist. LEXIS 151950, at p. *20.) The only limitation on the jury's ability to observe Eric's demeanor was the one rendered necessary by the circumstances. (See *United States v. James* (D. Ariz. Oct. 15, 2020, No. CR-19-08019-001-PCT-DLR) 2020 U.S. Dist. LEXIS 190783, at p. *5 ["The only element that the mask protocol might interfere with is the fourth: observation of demeanor"].) We therefore conclude the reliability of his testimony was otherwise assured. (*Id.* at p. *6; cf. *Craig, supra*, 497 U.S. at p. 851 ["the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony"].) On the facts presented by this case, the trial court did not violate defendant's rights under the Confrontation Clause by requiring Eric to testify with a mask on.

B.      *Premeditation*

The jury convicted defendant of first degree murder of George in count 1 based on a theory of premeditation and deliberation. Defendant argues the evidence was insufficient to sustain the finding of premeditation and deliberation. We disagree.

"The law we apply in assessing a claim of sufficiency of the evidence is well established: ' " ' " [T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' [Citation.] The standard is the same under the state and federal due process clauses. [Citation.] 'We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved." ' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) If the murder is "willful, deliberate, and premeditated," it is of the first degree. (§ 189, subd. (a).) " ' " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " [Citation.] " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

Defendant's arguments are based in part on the so-called *Anderson* factors. Our Supreme Court has explained that in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), "we identified 'three basic categories' of evidence this court has generally found

11

sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" . . . .' [Citation.] [¶] In the years since *Anderson*, ' "we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." ' [Citation.] *Anderson* provides 'a framework to aid in appellate review,' but it does not 'define the elements of first degree murder or alter the substantive law of murder in any way.' " (*People v. Morales, supra*, 10 Cal.5th at pp. 88-89.) The *Anderson* "factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation. [Citation.] However, '[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.' " (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Defendant argues the planning and manner of killing factors do not support a finding of premeditation and deliberation. We conclude sufficient evidence supported the jury's finding.

The evidence suggests George had tried to shoot defendant, and defendant waited several hours to seek his revenge. He borrowed a truck, drove to where George was sleeping, unzipped the tent, shot George in the torso, and then zipped the tent back up.

Defendant argues "the evidence viewed in the light most favorable to the prosecution reveals strong evidence of an intent to injure [George] but weak evidence of a specific intent to kill [George]" because defendant told Michael he needed to call an

12

ambulance and the victim was shot in the hand and groin. As defendant noted in his summary of his case at trial, the jury also heard evidence that Michael did not initially tell law enforcement about this alleged statement. Even assuming the jury believed defendant said this, the fact that the jury could have drawn those inferences from his statement and the location of the bullet wounds does not necessitate reversal. (*People v. Gonzales and Soliz, supra*, 52 Cal.4th at p. 295 [" '[i]f the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding' "].) The evidence was sufficient to support the jury's finding that George's murder was premeditated and deliberate.

## C.     *Section 654*

In his first supplemental opening brief, defendant argues the court was required by section 654 to stay one of his two convictions for possession of a firearm by a person convicted of a felony and asks us to modify the judgment to stay the sentence on count 4. The People appear to have conceded the issue as they did not respond.

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." " 'Section 654 precludes multiple punishment for a single act or for a course of conduct comprising indivisible acts. "Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor." [Citations.] "If all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." ' " (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 129 (*Spirlin*).)

In *Spirlin*, the defendant robbed the same gas station on separate occasions, about one month apart. (*Spirlin, supra*, 81 Cal.App.4th at p. 123.) In each robbery, the defendant pointed a gun at one of the co-owners of the station. (*Ibid.*) Several days after

13

the second robbery, the defendant was arrested and discovered to be in possession of a gun. (*Id*. at p. 130.) Based on these facts, the defendant was convicted of three counts of being a felon in possession of a handgun and a separate, consecutive sentence was imposed on each count. (*Id*. at pp. 128-129.)

The *Spirlin* court concluded only a single punishment for the possession was proper, noting that the crime of gun possession by a felon does not require any specific criminal intent; possession can be actual or constructive; the evidence supported an inference that the defendant maintained possession of the gun during the time period covered by the offenses; and there was no dispute the same gun was used by the defendant during two robberies and was found at his apartment when he was arrested. (*Spirlin, supra*, 81 Cal.App.4th at pp. 130-131.) The court explained: "[D]efendant had continuous constructive possession of the gun from a couple of months before the robberies to when the gun was found in defendant's apartment. While what defendant did later with the weapon, i.e., commit the robberies, were 'separate and distinct transaction[s] undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon' [citation], the same cannot be said of his continuous possession of the weapon. In other words, defendant's intent to possess the weapon as a felon did not change each time he committed a robbery or when he was arrested and the gun confiscated." (*Ibid*.)

There appears to be no basis on which to distinguish *Spirlin*. The evidence showed defendant used the same gun in both shootings and that he maintained possession of the gun between them. At sentencing, the parties expressed a belief that section 654 was inapplicable because the evidence showed defendant had continuous possession of the firearm and the charged incidents were separated by months. In imposing consecutive sentences on counts 3 and 4, the court explained: "these are separate crimes, separate times, separate places. He did possess the gun, and the crime was committed at the time of possession, even though he used the same gun in each of those cases to then

14

fire the weapon and injure the victim.  But in each case he possessed it prior to that time, so I don't think that [section] 654 will apply to either of those."  None of these statements provide a basis for imposing consecutive sentences on *both* possession counts.  Under the circumstances, we will accept the People's implied concession that one of defendant's convictions for firearm possession should have been stayed under section 654.

D.     *Defendant's Requests for Resentencing*

As set forth above, on December 11, 2020, the court sentenced defendant to a total term of 75 years to life, plus 23 years eight months in prison:  50 years to life (25 years to life doubled for the prior strike) for count 1, plus 25 years to life for personally and intentionally discharging a firearm and causing death (§ 12022.53, subd. (d)); 11 years (five years and six months doubled) for count 2, plus 10 years for personal use of a firearm (§ 12022.5, subd. (a)); and 16 months each (eight months doubled) on counts 3 and 4.  While defendant's appeal was pending, the Legislature amended our determinate sentencing law, section 1170, and our Supreme Court decided *People v. Tirado, supra*, 12 Cal.5th 688.  In his second supplemental opening brief, defendant argues resentencing is required based on these changes in the law.  We begin with the recent amendments to section 1170.

1.     *Amendments to Section 1170*

At the time of defendant's sentencing, section 1170, subdivision (b) provided that "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court."  (Stats. 2020, ch. 29, § 14.)  Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) amended this provision effective January 1, 2022, and divided it into subparts.  Section 1170, subdivision (b)(1) provides "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)."  The referenced exception provides that an upper term sentence may be imposed "only when there are circumstances in aggravation of the

15

crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."[2] (§ 1170, subd. (b)(3).) Additionally, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense," including "(A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (§ 1170, subd. (b)(6).)

"The People correctly concede the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal." (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

Prior to imposing sentence, the trial court explained generally that there were multiple circumstances in aggravation: "Under [California Rule of Court, rule 4.421](a)(1), the crime involved great violence, great bodily harm, and other acts showing a high degree of cruelty. [¶] Rule 4.421(a)](3), the victim in Count 1 was particularly vulnerable as he was asleep in his tent. [¶] Under (a)(8), the manner in which the crimes were carried out indicates planning. Not the most sophisticated planning, but planning. [¶] Under (b)(1), the defendant has engaged in prior violent conduct, which indicates a serious danger to society. [¶] Under (b)(2), the defendant's

---

[2] "This paragraph does not apply to enhancements imposed on prior convictions." (§ 1170, subd. (b)(3).)

prior convictions as an adult are numerous. [¶] Under (b)(3), the defendant has served multiple prior prison terms. [¶] Under (b)(4), the defendant was on parole when the crimes were committed. [¶] And under (b)(5), the defendant's prior performance on parole and probation was unsatisfactory." The court selected the upper term for count 2 "based on the fact that [defendant] has numerous acts of felony convictions in his past, and prior prison terms." The court also selected the 10-year upper term for the associated firearm enhancement without specifying that the basis was the same.

Defendant argues the upper terms on count 2 and the associated firearm enhancement must be vacated and remanded because the court's stated reasons for imposing the upper terms do not comply with the requirements of amended section 1170. None of the factors the trial court mentioned were submitted to the jury or stipulated to by defendant. In the context of the prior strike allegation, the trial court found true based on a certified record of conviction that in 2016, defendant was convicted of willful infliction of corporal injury on a spouse with an enhancement for causing great bodily injury. (§§ 273.5, 12022.7, subd. (e).) The probation report reflects that defendant was previously convicted of three additional felonies and two misdemeanors, all on separate dates between 2009 and 2015. The People argue any error is harmless and remand is unnecessary because a jury would have found at least one of the aggravating factors relied upon by the trial court true beyond a reasonable doubt. The People contend the trial court's reliance on information in the probation report reflecting defendant's recidivism was harmless given that the same information would have been readily available from official records. The People view the situation as akin to error under *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*), which held a prior version of section 1170, subdivision (b) unconstitutional because it allowed a sentencing court, rather than the jury, to find the facts that exposed a defendant to an elevated sentence. (*Id.* at pp. 274, 277.) *Cunningham* error—denial of the right to a jury trial on aggravating circumstances—was held to be subject to harmless error view under

17

*Chapman v. California* (1967) 386 U.S. 18.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 838-839.)  In that context, "if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless."  (*Id*. at p. 839.)  "[A]s long as a single aggravating circumstance complying with *Cunningham* 'renders a defendant *eligible* for the upper term sentence,' 'any additional fact finding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to jury trial.' "  (*People v. Scott* (2015) 61 Cal.4th 363, 404-405.)

The issue in the present case is more complicated than *Cunningham* error because defendant's sentencing also failed to comply with state sentencing law as recently amended.  These amendments not only generally require the jury to find aggravating circumstances in order for the trial court to rely on them, but they also change the framework within which the trial court exercises its discretion by specifying that the court may not impose a term greater than the middle term unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term" and, if specified mitigating contributing circumstances are present, the aggravating factors also "outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice."  (§ 1170, subd. (b)(2), (6).)[3]

---

[3]  The People note amended section 1170, subdivision (b) does not require the court to rely on a minimum number of aggravating circumstances to impose an upper term sentence.  We agree with this observation, but it does not mean the recent amendments have not altered the trial court's discretion in any way.

As defendant observes on reply, he is " 'entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Additionally, "[i]n order to determine whether error by the trial court in relying upon improper factors in aggravation requires remanding for resentencing 'the reviewing court must determine if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Avalos* (1984) 37 Cal.3d 216, 233.)

Here, it is not clear what the trial court would have done if it was sentencing under the amended statute, particularly in light of the lack of clarity as to the trial court's reasons for choosing the upper term on the section 12022.5 enhancement. Thus, we will remand for resentencing. (*People v. Flores, supra*, 73 Cal.App.5th at p. 1039.)

2.      *Tirado*

"Before January 1, 2018, section 12022.53 prohibited courts from striking its enhancements." (*Tirado, supra*, 12 Cal.5th at p. 695.) In 2017, the Legislature removed this prohibition: "Section 12022.53[, subdivision ](h) now provides that a 'court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.' " (*Id.* at p. 696.) At sentencing, the trial court stated it was "aware that I do have discretion now under the law—under 12022.53 and under 12022.5 . . . not to impose those sentences if I felt like it was not necessary in the interest of justice. I do not, however, think that it would be just or fair to not punish the defendant for the use of a firearm in these offenses.

19

[¶] Quite the contrary. I think it would be unjust if I did not impose sentencing on those . . . . [¶] So the Court . . . will not exercise its discretion to strike the firearm enhancements in this case." At the time of defendant's sentencing, Courts of Appeal had split on the question of whether a trial court could "strike the section 12022.53[, subdivision ](d) enhancement and, in its place, impose a lesser enhancement under section 12022.53[, subdivision ](b) or section 12022.53[, subdivision ](c), even if the lesser enhancements were not specifically charged in the information or found true by the jury." (*Ibid*.) Our Supreme Court in *Tirado* answered the question in the affirmative. (*Id*. at p. 692.) In his second supplemental opening brief, defendant argues we must remand for the trial court to exercise its new discretion under *Tirado*. The People argue defendant has forfeited this argument by failing to raise it in the trial court. *Tirado* itself did not reach the question of forfeiture. (*Id.* at p. 702.) We need not decide the issue because we are remanding for resentencing based on the recent amendments to section 1170. During that resentencing, the trial court may reconsider all sentencing choices previously made. (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258.) Thus, the trial court will be able to reconsider whether to strike defendant's section 12022.53, subdivision (d) enhancement at that time. Following *Tirado*, if the trial court decides to strike this enhancement, it may instead impose one of the lesser enhancements.

## III.  DISPOSITION

Defendant's convictions and enhancement findings are affirmed.  The sentence imposed is vacated and the matter is remanded for resentencing consistent with this opinion.

/S/

_____
RENNER, J.

We concur:

/S/

_____
MAURO, Acting P. J.

/S/

_____
EARL, J.